# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3660
No. 08-1266

_____

| | | |
|---|---|---|
| Nora E. Keating and | * | |
| Richard L. Shearer, | * | |
| | * | |
| Petitioners - Appellants, | * | Appeal from the |
| | * | United States Tax Court. |
| v. | * | |
| | * | |
| Commissioner of Internal Revenue, | * | |
| | * | |
| Respondent - Appellee. | * | |

_____

Submitted: September 24, 2008
Filed: October 14, 2008

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Nora E. Keating and Richard L. Shearer filed a petition in United States Tax Court challenging the determination of the Commissioner of Internal Revenue (Commissioner) that because Keating engaged in her horse breeding activity as a hobby rather than for profit, losses from the activity were incorrectly deducted on their 1996 through 2002 tax returns, resulting in deficiencies in their federal income tax

obligations.  Following a trial the tax court[1] concluded that Keating had not engaged in the horse activity for profit and ordered Keating and Shearer liable for all deficiencies assessed by the Commissioner.  Keating and Shearer appeal, and we affirm.

In 1996 Keating moved to Williston, North Dakota, where she began work as an emergency room physician and purchased a home on a 10 acre farm.  She worked approximately 60 hours per week, preferring two 24 hour shifts and one 12 hour shift because she felt "burned out" from medical school and because it allowed her more full days with her six children.  Her average annual salary was $238,134.  Her husband at the time, Richard Shearer, worked as a firefighter medic.  The two filed joint federal income tax returns from 1996 through 2000 but divorced prior to the filing of Keating's 2001 individual income tax return.

Also in 1996, Keating realized a lifelong dream of working with horses when she purchased four Arabians, which she considers the "ballerinas of the horse world." She had always loved horses and had experience owning, caring for, and riding them dating back to high school when she worked in a veterinary clinic, belonged to several riding clubs, and purchased and boarded her first horse at age 15.

When Keating purchased the Arabians in 1996 she spoke with an award winning Arabian horse breeder, two horse trainers, and a veterinarian about training methods, breeding, selection of stallions and mares, and veterinary issues including factors that could result in early termination of pregnancy.  She also spoke with people who had been audited for their horse activities; they recommended that she keep good expense records and all receipts.  She consulted a certified public accountant (CPA) regarding tracking receipts and maintaining records.

---

[1]The Honorable Stephen J. Swift, Judge, United States Tax Court.

Although Keating had extensive experience caring for and riding horses, she had no experience in the business of buying, selling, or showing horses, and she presented no evidence at trial that she had consulted anyone regarding the economic or business aspects of breeding, training, or showing horses. Between 1996 and 2002 Keating purchased 13 horses and bred 7, but she sold only 2 horses, each for half of its purchase price.

Keating did not change her work schedule after purchasing the Arabians, but on each day off she spent approximately 7 to 10 hours with the horses. She engaged in their training and feeding, and she also rode them, cleaned their stalls, performed basic veterinary work, and competed in shows. Before a showing she would hire a professional trainer to finish training the horses. Keating and her daughter rode in many shows which gave her great pride, and on four occasions her horses participated in nationally competitive horse shows.

In 2000 Keating built a barn to shelter the horses during the breeding months. In 2001 she began boarding other people's horses, leasing out her own horses, and providing horse clinics, but she did not advertise the boarding and leasing services. She advertised that her horses were for sale by word of mouth, by showing them, and by advertising on three websites; she did not advertise in any written publication.

Between 1996 and 2001, Keating paid both personal and horse activity expenses from the same two or three personal checking accounts. In 2002 she opened a checking account in the name of Nora Ellen Keating Stony Creek Arabians (Stony Creek Arabians) and two new personal checking accounts, but she continued to pay personal and horse activity expenses from all three accounts. For example, she deposited the proceeds from the 2002 sales of the two horses in one of her personal accounts, not the Stony Creek Arabians account. She kept a ledger of total horse activity expenses, retained receipts by month of transaction, and kept records of training, ovulatory cycles, and vaccinations relating to each horse. She did not,

however, keep expense records for each individual horse. She had no written business plan and no financial projections relating to her horse activity.

Keating and Shearer filed joint federal income tax returns for 1996 through 2000 and Keating filed individual federal income tax returns for 2001 and 2002, each of which listed "horses" as the principal activity on Form 1040 Schedule F, "Profit or Loss from Farming." The following gross income, expense, and net loss amounts attributable to the horse activity were included on Schedule F:

| Year | Gross Income | Expenses | Net Loss |
|------|-------------|----------|----------|
| 1996 | $     144 | $    22,227 | $    (22,083) |
| 1997 | 178 | 22,187 | (22,009) |
| 1998 | 335 | 48,289 | (47,954) |
| 1999 | 432 | 44,784 | (44,352) |
| 2000 | 750 | 50,550 | (49,800) |
| 2001 | 1,200 | 84,382 | (83,182) |
| 2002 | 1,418 | 102,550 | (101,132) |

These losses reduced reported taxable income dollar for dollar, resulting in substantial tax savings. In 2005 the Commissioner audited these federal income tax returns and concluded that the horse activity was not engaged in for profit. As a result the Commissioner disallowed the horse activity losses on Schedule F for each year examined and issued Notices of Deficiency asserting that Keating and Shearer owed additional taxes equal to their entire claimed tax benefit from the horse activity:

| Tax Year | Tax Deficiency/Additional Tax Owed |
|----------|-----------------------------------|
| 1996 | $     7,784 |
| 1997 | 6,507 |
| 1998 | 18,181 |

| | |
|---|---|
| 1999 | 16,191 |
| 2000 | 20,219 |
| 2001 | 29,066 |
| 2002 | 35,815 |

Keating and Shearer filed a petition in United States Tax Court for a redetermination of the deficiencies assessed by the Commissioner, and the matter was tried in 2007. Based on its analysis of all of the facts and circumstances the tax court concluded that a preponderance of the evidence supported the Commissioner's determination that the horse activity was not engaged in for profit, and concluded that Keating and Shearer were liable for all deficiencies assessed by the Commissioner.

Keating and Shearer appeal, claiming that the tax court erred in concluding that Keating's horse breeding activity was not carried out with a profit motive. This is a factual determination which we review for clear error and must affirm unless left with a conviction that the tax court has committed a mistake. See Blodgett v. Comm'r, 394 F.3d 1030, 1034-35 (8th Cir. 2005). Keating argues that her horse activity was engaged in for profit. As evidence she cites the facts that she kept good records, spent most of her time outside of work with the horses, and invested her savings, earnings, and retirement funds in the horses with the expectation that they would provide income for her retirement. The Commissioner counters that these arguments were made to the tax court and that it did not err in concluding that the activity was not engaged in for profit.

The deductibility of taxpayer expenses related to an activity depends on whether it is carried on for profit. See 26 U.S.C. §§ 162, 212. Subject to two exceptions in 26 U.S.C. § 183(b) which do not apply here, a person may not deduct a loss attributable to an activity unless that activity is engaged in for profit. 26 U.S.C. § 183(a). For example, a taxpayer may not deduct losses related to an activity "carried on primarily as a sport, hobby, or for recreation." Treas. Reg. § 1.183-2(a).

An activity is engaged in for profit if the taxpayer has an actual, honest profit objective, even if it is unreasonable or unrealistic. Treas. Reg. § 1.183-2(a). Treasury Regulation § 1.183-2(b) includes a nonexhaustive list of nine factors to consider in determining whether a business is engaged in for profit: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses in respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements of personal pleasure or recreation. No single factor or even a majority of the factors is controlling, and all of the facts and circumstances must be evaluated, giving greater weight to objective facts than to the taxpayer's statement of intent. See Evans v. Comm'r, 908 F.2d 369, 373 (8th Cir. 1990).

The tax court thoroughly analyzed the facts and circumstances of Keating's horse activity as they related to each of the nine factors in Treasury Regulation § 1.183-2(b). It found that five of the factors favored the Commissioner's conclusion that the horse activity was not carried on for profit, four factors were neutral, and none favored Keating's argument that she engaged in the horse activity for profit.

The tax court concluded that the first factor—whether the activity is carried on in a businesslike manner and whether complete and accurate books and records are maintained—favored the Commissioner's finding of liability. It found that she had not carried on the horse breeding activity in a businesslike manner. She commingled her personal and horse funds in her various bank accounts even after opening the Stony Creek Arabians account, made meager efforts at advertising, made relatively small improvements to the grounds and operations, and had no written business plan. It also found that although her books and records were thorough in respect to each horse's vaccinations and ovulatory cycles, her failure to keep track of expenses on a per horse

basis and to prepare any financial projections to assess the economics of the activity indicated a lack of profit objective. See Filios v. Comm'r, 224 F.3d 16, 23 (1st Cir. 2000) (to indicate profit motive, records generally should assist in cutting expenses, increasing profits, making financial projections, and evaluating overall performance of business). It also found that the books and records were kept by Keating only to "memorialize for tax purposes the existence of the subject transactions."

The tax court found that the second factor—the taxpayer's expertise and preparation with regard to the economic aspects of the business—favored the Commissioner's determination. It said that although Keating consulted with breeders and horse experts regarding breeding and training, she was not an expert and did not seek expert advice regarding the economic aspects of the horse business. Burger v. Comm'r, 809 F.2d 355, 359 (7th Cir. 1987) (mechanics and economics of activity are separate areas of expertise, and failure to obtain expertise in economics of activity may indicate lack of profit objective). It found that she discussed tracking receipts with a CPA only for tax purposes.

The tax court found that the fourth factor—the expectation that assets used in the activity may appreciate in value—favored the Commissioner's determination because Keating presented no evidence of the value of the horses, making it impossible to determine their current or expected future value. The only two horses Keating sold between 1996 and 2002 were sold for less than half of their purchase price, suggesting that any expectation of appreciation may have been unreasonable.

The tax court concluded that the eighth factor—the financial status of the taxpayer—favored the Commissioner's determination because Keating had a high salary from her work as a physician and had $133,763 in claimed tax savings from the horse activity over seven years. See Treas. Reg. § 1.183-2(b)(8) (substantial income from sources other than activity in question may indicate activity not carried on for profit, especially where losses generate substantial tax benefits).

-7-

The tax court concluded that the ninth factor—elements of personal pleasure or recreation—favored the Commissioner's determination because the recreational aspects of Keating's horse activity and the fact that her daughter rode recreationally suggest an activity without a profit objective. See Montagne v. Comm'r, T.C. Memo. 2004-252, 2004 WL 2504388 at *3 (U.S. Tax Ct. 2004) (concession that family enjoyed riding and competing with horses showed lack of profit objective), aff'd, 166 Fed. Appx. 265 (8th Cir. 2006).

With the exception of the eighth factor—taxpayer's financial status—which she did not discuss on appeal, Keating and Shearer argue that the tax court erred in its factual determinations regarding each of the other factors. They argue that Keating kept detailed records, advertised, consulted experts for business advice, believed that the assets were increasing in value, and undertook many unpleasant chores related to the horse activity. The tax court's factual findings involved credibility determinations, however, which are virtually unreviewable on appeal. Blodgett, 394 F.3d at 1035. The evidence in the record established that Keating did not have a written business plan or financial projections for the horse activity, commingled horse related funds in her personal and horse activity accounts, failed to develop economic expertise regarding the horse breeding business, and derived great pride and enjoyment from showing the horses. In light of these objective facts we cannot say that the tax court erred in its factual determinations.

Keating also argues that the tax court erred because two of the four factors which it found neutral—factors six and seven regarding the history of income or losses and any occasional profits—favored Keating's position that she engaged in the horse activity for profit. The tax court concluded that these factors were neutral because although Keating had consistent and increasing losses over the seven years at issue, a horse business may have a five to ten year startup phase during which the taxpayer may incur losses before turning a profit. See, e.g., Davis v. Comm'r, T.C. Memo. 2000-101, 2000 WL 307276 at *10 (U.S. Tax Ct. 2000). Because Keating's

horse activity incurred consistent and increasing losses, however, it was not clear error for the tax court to find these factors neutral rather than in favor of Keating's position.

The tax court did not err in concluding that based on all of the facts and circumstances, including an analysis of the nine factors in Treasury Regulation § 1.183-1(b)(2), a preponderance of the evidence supported the Commissioner's determination that Keating's horse activity was not engaged in for profit. Accordingly, the court did not err in concluding that Keating and Shearer were liable for the tax deficiencies as assessed by the Commissioner.

Keating and Shearer also contend that a remand to the tax court would be in order because it erred in failing to shift the burden of proof to the Commissioner to disprove their entitlement to the loss deductions. We presume that the Commissioner's determination regarding the existence of a tax deficiency is correct, requiring the taxpayer to bear the burden of proving entitlement to a claimed deduction by a preponderance of the evidence. Blodgett, 394 F.3d at 1035. This burden shifts to the Commissioner to disprove the entitlement if the taxpayer introduces "credible evidence" with respect to the tax liability. 26 U.S.C. § 7491. We review de novo the legal question of whether a taxpayer produced evidence sufficient to shift the burden of proof to the IRS under 26 U.S.C. § 7491, Blodgett, 394 F.3d at 1035, but must recognize that "a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie," id. at 1039 (party supported by weight of evidence will prevail regardless of who bore burden of proof). The tax court stated that "[t]his case is decided on the preponderance of the evidence and is unaffected by section 7491." Any error in assigning the burden of proof would have been harmless under the circumstances, and there is no basis upon which to remand this matter for further proceedings.

Accordingly, we affirm the judgment of the tax court.

_____