T.C. Memo. 2016-225

UNITED STATES TAX COURT

JERALD L. CARMODY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3825-14.                  Filed December 14, 2016.

<u>Robert V. Boeshaar</u>, for petitioner.

<u>Alicia H. Eyler</u>, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Chief Judge</u>:  Respondent determined the following deficiencies and accuracy-related penalties under section 6662(a)[1] with respect to petitioner's Federal income tax:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2010 | $29,212 | $5,842 |
| 2011 | 25,486 | 5,097 |
| 2012 | 25,023 | 5,005 |

After concessions,[2] the issues for consideration are:  (1) whether petitioner's horse racing activity during taxable years 2010-12 (years at issue) was an activity engaged in for profit within the meaning of section 183; (2) if so, whether petitioner's claimed deductions on Schedules C, Profit or Loss From Business, were for ordinary and necessary expenses pursuant to section 162, and whether petitioner substantiated expenses underlying his claimed Schedule C expense

------

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[2]Respondent has conceded that petitioner substantiated some of his reported expenses for the years at issue.  Other adjustments are computational and will not be discussed further.

**[*3]** deductions in excess of the amounts that respondent allowed; (3) whether petitioner is entitled to charitable contribution deductions for the years at issue; and (4) whether petitioner is liable for accuracy-related penalties under section 6662(a) for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated herein by this reference. Petitioner resided in Washington when he petitioned this Court.

Since 1989 petitioner has worked full time at Turbine Traders, Ltd. (Turbine Traders), as a marketing and sales representative. In his capacity as a sales representative petitioner sells parts and services for helicopter engines. Since 2005 petitioner has annually earned at least $132,000 in wages.

Petitioner has owned interests in and has raced horses for more than 20 years. Petitioner enjoyed watching and betting on horse races and spending time at racetracks before purchasing an interest in a race horse for the first time. He purchased his first interest in a race horse in 1987 when his nephew's friends invited him to coown a race horse with them. After racing that horse successfully, petitioner and his coowners purchased a horse from New Zealand for $100,000.

[*4] That horse, in which petitioner owned a 10% interest, won a race in San Diego, and the owners subsequently sold that horse for $200,000.

Petitioner continued to purchase interests in race horses and, in 2001, he purchased a five-acre property in Ravensdale, Washington (Ravensdale property), for $650,000. On the Ravensdale property are a 3,350-square-foot residence in which petitioner and his roommate Jerry Pelikan have lived since 2001; a 4,000-square-foot barn with horse stalls; a 5,000-square-foot arena; various outdoor horse shelters; and nine pastures. Petitioner has made several improvements to the Ravensdale property, such as restoring two barns, building run-in sheds for the horses, clearing the land, and adding several fence lines. Petitioner hires a handyman to make repairs and improvements to the Ravensdale property when necessary. A September 1, 2015, appraisal valued the property at $919,228.

During the years at issue petitioner used the Ravensdale property to board the horses in which he owned interests when they were not racing. Additionally, Mr. Pelikan operates a horse training business, Performance Matters, at the Ravensdale property. Mr. Pelikan uses the Ravensdale property to train show horses, board the horses that he is training, and teach horse training clinics. Mr. Pelikan or Performance Matters paid petitioner $6,000 a year from 2001 to 2007 to rent petitioner's barn and arena. Beginning in 2007 petitioner waived Mr.

[*5] Pelikan's rent in exchange for a reduced rate for Mr. Pelikan's purchasing the supplies for and caring for the horses in which petitioner owned interests.

During the years at issue petitioner coowned race horses with the following individuals or entities:  Rancho Viejo Stables (RV Stables) and/or its owner Rigoberto Velasquez, Lisa Baze, Kyrie Baze, Mr. Pelikan, and Pamela Tumminello.  Mr. Velasquez is a horse trainer, and RV Stables provides boarding and training for race horses.  Lisa Baze is married to Mr. Velasquez, and she is a horse trainer and a pony rider.[3]  Kyrie Baze is Lisa Baze's daughter, and she is also a pony rider.  The following table summarizes information about the horses in which petitioner owned interests during the years at issue:[4]

---

[3]Pony riders lead race horses from the racetrack stables to the starting gate.

[4]The parties stipulated that petitioner bought and sold a horse named Brainstorm in 2009.  However, statements for July, August, and September 2011 addressed to petitioner from RV Stables show shoeing and training/racing fees for Brainstorm.

[*6]

| Horse | Purchase date | Purchase price[1] | Ownership (percent) | Sale date | Sale price |
|---|---|---|---|---|---|
| Devilish Fact | 8/16/08 | $2,712 | 50 | 3/31/11 | -0- |
| Icy Ridge | 8/13/10 | 958 | 25 | 9/15/10 | -0- |
| Polo Bender | Unknown | Unknown | 50 | Unknown | Unknown |
| West Seattle Boy | Unknown | Unknown | 50 | Unknown | Unknown |
| Black N Silver | 9/7/10 | 750 | 25 | 8/29/12 | $750 |
| Delegocho | 11/16/09 | 2,000 | 50 | 6/1/10 | -0- |
| Flame Dancerr | 10/21/05 | 3,750 | 50 | 12/29/10 | 3,750 |
| Good Gold | 4/16/08 | 2,000 | 25 | 9/1/11 | -0- |
| GollyMzHolly | 12/6/09 | 2,000 | Unknown | 8/9/11 | -0- |
| Burgandy Hill | 9/25/11 | 1,250 | 5 | 11/26/11 | -0- |
| Gizmo Girl | 4/22/11 | 1,750 | 50 | 7/14/11 | 1,250 |
| Peak a Boot Song | 9/7/11 | 1,250 | 50 | 7/31/13 | 750 |
| Three Bales Left | 9/7/11 | 1,250 | 50 | 5/14/14 | 500 |
| Rich Debut | 4/11/11 | 1,000 | 50 | 6/8/12 | 650 |
| Squeallin By[2] | 9/25/11 | 1,250 | 50 | 1/19/12 | -0- |
| U Cant Tell Me No | 8/18/11 | 958 | 25 | 9/25/11 | 1,250 |
| Vaderator | 7/21/11 | 1,368 | 25 | 9/25/11 | 1,250 |
| Yasou | 9/11/11 | 1,916 | 50 | 9/30/11 | 2,500 |
| Havin A Good Day | 10/10/12 | 800 | Unknown | 9/26/14 | -0- |
| Dare Me Devil | 2/27/12 | 2,500 | Unknown | 4/3/14 | 17,500 |

[1]The record does not explain whether each purchase price amount was the full purchase price of each horse or only petitioner's portion of the price. However, petitioner appears to have claimed depreciation deductions with respect to the full amounts.

[2]The parties in the stipulation of facts and the stipulated exhibits spelled this horse's name at least four different ways.

[*7]    The horses in which petitioner owned interests raced at Portland Meadows racetrack in Portland, Oregon, and at Emerald Downs racetrack in Auburn, Washington (collectively, racetracks).  The racing season at Emerald Downs lasts from February through September each year, and the racing season at Portland Meadows lasts from October through February each year.  Each horse that races at the racetracks has the potential to win a portion of the prize money (purse).

During the years at issue three or four of the horses in which petitioner owned interests were actively racing at one or both of the racetracks.  From 2007 to 2015 petitioner owned a horse trailer for transporting the horses, and he hired a driver to transport the horses from his farm to the racetracks and back.  However, the horses were not transported back and forth from the racetracks to petitioner's property throughout the racing season but rather stayed at one of the racetracks for the duration of the season.  Petitioner paid a professional trainer to train each of the horses that was racing.

During the years at issue petitioner spent time every day on his horse racing activity.  In addition to entering horses in races, he researched on the Internet horses that would be racing during the current week, researched the performances of horses in which he had previously owned an interest, and also searched for other horses in which to purchase interests.  On the weekends petitioner cleaned

[*8] stalls and pastures, attended races at the racetracks, helped Mr. Pelikan care for the horses during the evenings, and watched videos of the races during the nights. Because the racing seasons at the racetracks span most of the year, petitioner engaged in these activities throughout the entire year.

To facilitate his participation in the horse racing activity, petitioner adjusted his work schedule at Turbine Traders. Before petitioner purchased the Ravensdale property, he generally worked at Turbine Traders from 7:30 a.m. to 5 p.m. During the years at issue petitioner generally worked at Turbine Traders from 8:30 a.m. until 4 p.m., except on Thursdays, when he usually left at noon.

Petitioner not only loves horses but also enjoys betting on horse races. He watches each race in which his horses compete at Emerald Downs and watches most of the races in which his horses compete at Portland Meadows. Petitioner reports gambling winnings separately on his Federal income tax returns as gambling income.

Petitioner has had some racing successes. Polo Bender, which petitioner coowned with RV Stables, won purses in four races in 2010. West Seattle Boy, which petitioner coowned with Lisa Baze in 2010-11, is Emerald Downs' alltime race winner with 21 wins. From 2001 to 2011 West Seattle Boy won purses totaling $166,850. In 2010-11, during which time petitioner owned him, West

[*9] Seattle Boy won seven races. Moreover, in 2011 Emerald Downs named petitioner owner of the year. Petitioner gave away his 50% interest in West Seattle Boy after the 2011 racing season.

In 2012 petitioner purchased an interest in Dare Me Devil for $2,500. In 2014 petitioner sold that interest for $17,500, but he later repurchased a 50% interest for $6,500. Since petitioner repurchased an interest in Dare Me Devil, the horse has won purses in four races, totaling over $40,000, which was split between petitioner and RV Stables. Dare Me Devil was also voted the top sprinter at one of the racetracks and, as of the time of trial, was racing for purses totaling between $25,000 and $40,000. When petitioner first purchased him, he was racing for $5,000 purses. In 2013-14 petitioner coowned a horse named Kenzie Carolina, which in both 2013 and 2014 was named the "leading mare in the nation for all Oregon breds".

Over the last few years petitioner has entered horses in races with purses between $8,000 and $25,000, but he occasionally enters horses in races with $50,000 purses. When a horse's racing career is over, petitioner and his coowners either give the horse away or sell it.

Although petitioner had some success racing horses, his horse racing activity still generated substantial losses in excess of his horse racing income from

**[*10]** 1990 until at least 2013.[5]  For tax years 2005-14 petitioner timely filed

Forms 1040, U.S. Individual Income Tax Return, and reported net losses from his

horse racing activity on Schedules C as follows:[6]

---

[5]Petitioner asserts that his 2014 Federal income tax return shows that he had a net profit of over $25,000 for that year because he reported $128,068 of Schedule C gross receipts, $144,132 of Schedule C expenses, and $41,390 of capital gains from the sale of horses or horse racing equipment.  Respondent has not had the opportunity to examine petitioner's 2014 return, which was filed during the pendency of this case, but contends that petitioner may have duplicated the 2014 sale of Dare Me Devil on the return.  Petitioner did not prove that his horse racing activity was profitable for 2014.  Petitioner also testified that he expected it to be profitable in 2015 but did not submit any credible evidence supporting his testimony.

[6]Although the record does not contain information from petitioner's Schedules C for years before 2005, the parties stipulated that petitioner sustained Schedule C losses from his horse racing activity every year beginning in 1990.

[*11]

| Year | Income | Expenses | Net profit/(loss) |
|---|---|---|---|
| 2005 | $22,006 | $93,216 | ($71,210) |
| 2006 | 48,661 | 130,006 | (81,345) |
| 2007 | 17,917 | 80,850 | (62,933) |
| 2008 | 62,916 | 124,152 | (61,236) |
| 2009 | 35,440 | 108,510 | (73,070) |
| 2010 | 40,603 | 106,449 | (65,846) |
| 2011 | 18,843 | 100,861 | (82,018) |
| 2012 | 39,291 | 99,002 | (59,711) |
| 2013 | 52,566 | 103,355 | (50,789) |
| 2014 | 128,068 | 144,132 | (16,064) |
| Average | 46,631 | 109,053 | (62,422) |

In addition to the Schedule C income and expenses, petitioner reported capital gains and losses attributable to the buying and selling of ownership interests in race horses and horse racing equipment for 2008-14 as follows:

[*12]

| Year | Capital gain/(loss) |
|------|---------------------|
| 2008 | ($6,401) |
| 2009 | (1,904) |
| 2010 | 4 |
| 2011 | (1,532) |
| 2012 | 1,540 |
| 2013 | (184) |
| 2014 | 41,390 |

To track the income and expenses of his horse racing activity, petitioner maintained a manila folder for each horse in which he would keep various receipts and documents related to the horse for that year.[7] Petitioner kept the folders in his home office at the Ravensdale property. Petitioner never created a formal written business plan, annual budgets, or profit or loss projections for his horse racing

[7]Petitioner testified that he learned how to keep records for his horse racing activity from booklets and brochures provided "every so often" by the racetracks as well as letters from his accountant outlining formats and guidelines to follow. However, petitioner did not submit into evidence any booklets, brochures, or letters. He further testified that he would use the documentation in the manila folders to create spreadsheets for each horse. For 2010 and 2011 petitioner offered examples for only two horses of how he would track income and expenses. Petitioner did not provide a spreadsheet for tax year 2012.

[*13] activity.[8]  From 2005 to 2014 petitioner sold interests in 36 race horses but realized a gain on only eight of those sales.

Petitioner had a personal bank account and a separate bank account for his horse racing activity.  Petitioner paid for horse racing expenses out of both his personal and his horse racing bank account.

Petitioner uses a portion of his wage income to fund his horse racing activity.  During the years at issue petitioner also received retirement income as follows:  for tax year 2010, petitioner had pension income of $48,500; and for tax years 2011 and 2012, petitioner had distributions from an individual retirement account of $25,000 for each year.

Since 1992, when the Internal Revenue Service (IRS) audited petitioner's return for the 1988 taxable year,[9] petitioner has hired Hurley & Hurley, Inc., an accounting firm that specializes in horse racing accounting, for advice about recordkeeping and to prepare his Federal income tax returns.  Every year

---

[8]Petitioner testified that, when he did not earn what he regarded as sufficient gross receipts from horse racing in a certain year, he would minimize expenses by doing fewer improvements around the farm or by selling horses that were not racing successfully.

[9]Petitioner testified that the IRS determined for 1988 that his horse racing activity was engaged in for profit but that he failed to substantiate some of his expenses for that year.

[*14] petitioner's accountant gave him a worksheet detailing expenses that petitioner may have paid in that year, and petitioner would fill in the worksheet with his expenses. Petitioner then mailed the worksheet and supporting receipts or other documentation to the accountant to prepare his Federal income tax returns.

In addition to petitioner's claimed Schedule C expense deductions, he also claimed cash charitable contribution deductions of $250 and noncash charitable contribution deductions of $500 for each of the years at issue. Petitioner provided only one Goodwill receipt, dated October 10, 2012, which did not list the items that were contributed, the value of any items, or petitioner's name. Petitioner did not submit any documentation for his alleged charitable contributions for 2010 or 2011.[10]

## OPINION

I.    Horse Racing Activity

Respondent determined that petitioner's horse racing activity was not an activity engaged in for profit within the meaning of section 183 and disallowed loss deductions that petitioner claimed on his Schedules C for the years at issue.

---

[10]Petitioner testified that he made annual donations of clothing and small appliances worth approximately $500 to Goodwill during the years at issue.

[*15] Petitioner contends that he engaged in his horse racing activity with an intent to realize a profit.

## A.     Statutory Framework

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." A taxpayer may not fully deduct expenses regarding an activity under section 162 if the taxpayer does not engage in the activity for profit. Sec. 183(a), (c); see Keanini v. Commissioner, 94 T.C. 41, 45 (1990). If a taxpayer does not engage in an activity for profit, no deduction attributable to that activity is allowed except to the extent provided by section 183(b). Sec. 183(a). In relevant part section 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are not allowable for an activity that taxpayers carry on primarily for sport, as a hobby, or for recreation in

[*16] excess of the taxpayer's income from the activity.  Sec. 1.183-2(a), Income Tax Regs.

Pursuant to section 183(d), an activity that consists in major part of the breeding, training, showing, or racing of horses is presumed to be engaged in for profit if the activity produces income in excess of deductions for any two of seven consecutive years unless the Commissioner establishes to the contrary.  See Wadlow v. Commissioner, 112 T.C. 247, 250 (1999).  Petitioner's horse racing activity failed to produce income in excess of its deductions at any time during its operation.  Accordingly, the presumption does not apply in this case.

This case appears to be appealable to the U.S. Court of Appeals for the Ninth Circuit, absent a stipulation to the contrary.  See sec. 7482(b)(1)(A), (2).  That court has held that a taxpayer can escape the section 183(a) bar on deductibility only by demonstrating that his predominant, primary, or principal objective in engaging in the activity was to realize an economic profit independent of tax savings.  Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212.

We determine whether the taxpayer has the requisite intent to earn a profit on the basis of all the facts and circumstances.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981);

[*17] sec. 1.183-2(b), Income Tax Regs. While this analysis requires consideration of the taxpayer's subjective intent, we also examine objective indicia of his motivation. Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472; see also sec. 1.183-2(a), Income Tax Regs. We accord greater weight to objective facts than to subjective statements of intent. Keanini v. Commissioner, 94 T.C. at 46; sec. 1.183-2(a), Income Tax Regs.

Generally, a taxpayer bears the burden of proving that the requisite profit objective exists. Rule 142(a); Westbrook v. Commissioner, 68 F.3d 868, 876 (5th Cir. 1995), aff'g per curiam T.C. Memo. 1993-634. The burden of proof may shift to the Commissioner if the taxpayer establishes that he or she complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests. See Higbee v. Commissioner, 116 T.C. 438, 441 (2001). We decide this issue on the preponderance of the evidence in the record. Our resolution does not depend upon which party bears the burden of proof. See Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009).

Section 1.183-2(b), Income Tax Regs., provides a nonexhaustive list of the following nine factors to determine whether an activity is engaged in for profit:

[*18] (1) whether the taxpayer carries on the activity in a businesslike manner; (2) the time and effort that the taxpayer expended in carrying on the activity; (3) whether the taxpayer has had success carrying on other similar activities; (4) the taxpayer's history of income or losses with respect to the activity; (5) the amount of occasional profits, if any, which are earned; (6) the taxpayer's financial status; (7) whether the taxpayer expects that the assets used in the activity might appreciate in value; (8) the expertise of the taxpayer and his advisers; and (9) elements of personal pleasure or recreation. All facts and circumstances are to be taken into account, and no single factor is determinative. Id.; see also Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309. Certain factors may be accorded more weight in a particular case because they have greater salience or persuasive value as applied to its facts. See Vitale v. Commissioner, T.C. Memo. 1999-131, slip. op at 18, aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000); Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (1989) (noting that all nine factors do not necessarily apply in every case).

B.    Analysis

We focus on the factors that are most important and applicable in this case. Our analysis of these factors leads to the conclusion that petitioner did not engage

[*19] in his horse racing activity during the years at issue with the predominant, primary, or principal objective of making a profit independent of the tax savings. See Wolf v. Commissioner, 4 F.3d at 713.

### 1.    Manner in Which Activity Is Conducted

Conducting an activity in a businesslike manner may show that the taxpayer intends to earn a profit from it.  Sec. 1.183-2(b)(1), Income Tax Regs.  Facts evidencing a businesslike manner may include the taxpayer's maintenance of complete and accurate books and records; the taxpayer's conduct of the activity in a manner resembling that in which successful practitioners conduct similar business activities; and the taxpayer's change of operating procedures, adoption of new techniques, or abandonment of unprofitable activities in a manner consistent with a desire to improve profitability.  See Giles v. Commissioner, T.C. Memo. 2006-15, slip op. at 20-29; sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner contends that he operated his horse racing activity in a businesslike manner because he maintained accurate books and records by keeping a separate folder for his income and expenses for each horse, reviewing accounting booklets from racetracks, seeking out guidance from an accountant specializing in horse racing accounting, and abandoning unprofitable methods of conducting his activity.  Respondent asserts that petitioner's books and records

[*20] served no part in controlling costs or increasing profitability. Respondent further contends that petitioner failed to produce evidence showing that his horse racing activity operated similarly to other profitable activities or that he adopted material changes to foster profitability during nearly three decades of conducting his horse racing activity.

Petitioner produced income and expense spreadsheets and copies of invoices and receipts accounting for some of his expenses for the years at issue. Petitioner introduced expense spreadsheets with respect to only two horses, Polo Bender and West Seattle Boy, for tax years 2010 and 2011, respectively, which were merely summaries of expenses reflected on checks and receipts. Petitioner did not use the spreadsheets or the underlying invoices and receipts to minimize losses and/or generate profit. See McKeever v. Commissioner, T.C. Memo. 2000-288, slip op. at 27 (explaining that to indicate profit motive taxpayers must use their books and records to try to reduce losses and achieve profitability).

Petitioner did not have a written business plan. He did not maintain budgets or prepare economic forecasts. In fact, the record is devoid of any credible evidence that petitioner engaged in any meaningful financial management with respect to his horse racing activity. See Keating v. Commissioner, 544 F.3d at 904; Foster v. Commissioner, T.C. Memo. 2012-207, slip op. at 13-14. Although

[*21] petitioner's receipts and other documentation were voluminous, the evidence demonstrates that his recordkeeping was nothing more than a conscious attention to detail. See Golanty v. Commissioner, 72 T.C. at 430.

While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that enable the taxpayer to make informed business decisions. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), aff'g T.C. Memo. 1985-523. For a taxpayer's books and records to indicate a profit motive, the books and records should enable a taxpayer to cut expenses, generate or increase profits, or evaluate the overall performance of the operation. See Abbene v. Commissioner, T.C. Memo. 1998-330, slip op. at 19. Petitioner did not use his records to do any of these things, and he did not prove that the records he kept were sufficient to enable him to manage the financial aspects of his horse racing activity. See Keating v. Commissioner, slip op. at 11-12. Petitioner's financial management was limited to keeping records and providing them to his accountant.

Perhaps the most important indication of whether an activity is being carried on in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income. See Dodge v. Commissioner, T.C. Memo. 1998-89, slip op. at 10-11, aff'd, 188 F.3d

[*22] 507 (6th Cir. 1999).  Petitioner contends he worked to reduce his expenses, including minimizing expenses at times by making fewer improvements to the Ravensdale property or selling underperforming horses, but he introduced no credible evidence to prove how these steps, even if he took them, reduced expenses and minimized his substantial losses.  See Dennis v. Commissioner, T.C. Memo. 2010-216, slip op. at 20-22 (holding that the taxpayers demonstrated a profit objective with respect to reducing expenses where they provided calculations showing the cost-reducing effects of performing certain veterinary and horse care services).  Moreover, the record does not clearly and credibly establish that petitioner expeditiously sold unprofitable horses or abandoned other unprofitable aspects of his horse racing activity as he claimed.  See Wesinger v. Commissioner, T.C. Memo. 1999-372, slip op. at 17 (holding that a lack of profit objective was indicated where the taxpayer failed to expeditiously abandon a business technique that had not been profitable).  At most the record contains evidence of a few horse sales, but it fails to establish that these sales were the result of any meaningful financial management or were part of any cost-cutting initiatives.

Other evidence in the record reinforces our conclusion that petitioner's horse racing activity was not operated like a business.  For example, petitioner

[*23] waived Mr. Pelikan's rent starting in 2007 ostensibly for a reduced rate on boarding and caring for petitioner's own horses at the Ravensdale property. However, this occurred when the horses in which petitioner owned interests were rarely at the farm because of their year-round racing schedule. Petitioner also commingled his personal and horse racing finances. Although he had personal and horse racing bank accounts with Wells Fargo, petitioner paid his horse racing expenses from both accounts. This commingling of personal and horse racing activity funds is not indicative of a businesslike practice. See Montagne v. Commissioner, T.C. Memo. 2004-252, slip op. at 7, aff'd, 166 F. App'x 265 (8th Cir. 2006).

We are not persuaded that petitioner carried on his horse racing activity in a businesslike manner. This factor favors respondent.

### 2. Taxpayer's Time and Effort

A taxpayer's expenditure of personal time and effort to carry on an activity may indicate an intention to derive profit, particularly where there are no substantial personal or recreational elements associated with the activity. Sec. 1.183-2(b)(3), Income Tax Regs. Respondent contends that petitioner's time and effort spent on his horse racing activity was limited by his full-time employment. Although petitioner was employed full time while he conducted his horse racing

**[*24]** activity, we accept as credible that he (1) used the Internet to check horses' past performances, research horses that were racing in upcoming weekends, and search for other horses; (2) altered his work schedule at Turbine Traders ostensibly to accommodate his horse racing activity; and (3) performed menial tasks such as cleaning the barn stalls and picking up horse manure on the weekends. See Foster v. Commissioner, slip op. at 18. This factor weighs in favor of a profit objective.

### 3. Taxpayer's Success in Other Activities

A taxpayer's success in other business ventures may indicate that the taxpayer has the entrepreneurial skills and determination to succeed in subsequent endeavors. This in turn may imply that the taxpayer, when embarking on these endeavors, does so with the expectation of making a profit. Sec. 1.183-2(b)(5), Income Tax Regs. Although petitioner has been employed at Turbine Traders since 1989, the record contains no credible evidence that petitioner has engaged in other successful business enterprises as an owner or operator. Moreover, prior success in business does not necessarily imply a profit objective for a new activity that might be a hobby or sport. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *26. This factor is neutral at best.

**[\*25]**      4.      History of Income or Losses

A history of continued losses with respect to an activity may indicate a lack of profit motive. See sec. 1.183-2(b)(6), Income Tax Regs. While a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of profit motive, a record of large losses over many years is persuasive evidence that the taxpayer did not have such a motive. Golanty v. Commissioner, 72 T.C. at 426; Foster v. Commissioner, slip op. at 19-21. If an activity's cumulative losses are of such magnitude that an overall profit on the entire operation, including recoupment of past losses, could not possibly be achieved, the activity's history of losses is compelling evidence of a lack of intention to make a profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967); Foster v. Commissioner, slip op. at 20. If, however, losses are sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer, such losses are not necessarily an indication of a lack of profit motive. See sec. 1.183-2(b)(6), Income Tax Regs.

Petitioner realized no profits in more than 20 years of engaging in his horse racing activity. He contends that he suffered losses because he reinvested his gross receipts back into the horse racing activity and that he used his gross receipts to improve his barns, arena, and other horse racing activity property. Petitioner's

[*26] contentions are woefully insufficient to justify or even explain an unbroken string of over 20 years of substantial losses. This factor strongly favors a finding that petitioner lacked a profit motive for his horse racing activity.

### 5. Amount of Occasional Profits

The amounts of profits in relation to the amounts of losses with respect to an activity may be useful in determining a taxpayer's profit motive. Sec. 1.183-2(b)(7), Income Tax Regs. The opportunity to earn substantial profits in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit, even though the activity sustains losses. See id. A taxpayer's belief that he could one day sell a horse for a substantial amount of revenue and a correspondingly large profit may be indicative of a profit motive if that belief is adequately supported. See Giles v. Commissioner, slip op. at 42.

Petitioner contends that he could earn a substantial profit with one outstanding horse. Petitioner purchased his interest in Dare Me Devil in 2012 for $2,500, then sold his interest in 2014 for $17,500, and later repurchased a 50% interest for $6,500. Petitioner points to Dare Me Devil's success as the reason his horse racing activity was profitable in 2014 and potentially profitable in 2015. Although evidence from years after the years at issue may be relevant to the extent it permits the Court to draw inferences regarding the taxpayer's requisite profit

[*27] objective in earlier years, see, e.g., Foster v. Commissioner, slip op. at 11-12, we do not accept as credible petitioner's contention of profitability in 2014, and the possibility of a speculative profit in 2015 or beyond is insufficient to outweigh the absence of profits for a sustained period of years, see Chandler v. Commissioner, T.C. Memo. 2010-92, slip op. at 15-16 (holding that the possibility of a speculative profit did not outweigh more than 20 years of losses reported for the taxpayer's horse activity), aff'd, 481 F. App'x 400 (9th Cir. 2012); McKeever v. Commissioner, slip op. at 42 (holding that the possibility of a speculative profit did not outweigh 11 consecutive years of horse activity losses). This factor strongly supports a finding that petitioner lacked a profit motive for his horse racing activity.

6.      Taxpayer's Financial Status

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. A taxpayer with substantial income unrelated to the activity can more readily afford a hobby. Foster v. Commissioner, slip op. at 21-22. This is particularly true if the losses from the activity might generate substantial tax benefits. Golanty v. Commissioner, 72 T.C. at 429.

[*28] Petitioner does not earn sufficient income from his horse racing activity to pay basic living expenses. Petitioner's income from Turbine Traders allowed him to continue his horse racing activity despite over 20 years of sustained losses. Additionally, during the years at issue petitioner received retirement income of $48,500, $25,000, and $25,000, respectively. Petitioner's horse racing activity generated generous tax savings in the form of net losses that offset his other income. This factor favors a finding that petitioner lacked a profit motive for his horse racing activity.

### 7.    Expectation That Assets May Appreciate

Petitioner contends that the Ravensdale property and some of his horses have increased in value and that this increase indicates a profit motive. An expectation that assets used in the activity will appreciate may indicate a profit motive even if the taxpayer derives no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. A profit objective, however, may be inferred from such expected appreciation of the activity's assets only where the appreciation exceeds operating expenses and would be sufficient to recoup the accumulated losses of prior years. Foster v. Commissioner, slip op. at 19; see Golanty v. Commissioner, 72 T.C. at 427-428.

**[*29]** Petitioner purchased the Ravensdale property for $650,000 in 2001, and it was appraised at $919,228 in September 2015. Petitioner has not submitted any credible evidence of his adjusted basis in the Ravensdale property. There is no credible evidence in the record that the expectation of future appreciation of the Ravensdale property even begins to approach the amounts of losses petitioner has reported since beginning his horse racing activity. Moreover, petitioner's vague contention that he "has sold some of his interests in his horses for more than he paid for these interests, especially in more recent years" is utterly unconvincing as an indicator of a profit motive. At best, this factor is neutral.

### 8. The Expertise of the Taxpayer or His Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with industry experts, may indicate a profit motive where the taxpayer carries on the activity in accordance with such practices. Engdahl v. Commissioner, 72 T.C. 659, 668 (1979); Lundquist v. Commissioner, T.C. Memo. 1999-83, slip op. at 22, aff'd, 211 F.3d 600 (11th Cir. 2000); sec. 1.183-2(b)(2), Income Tax Regs. Efforts to gain experience and a willingness to follow expert advice may also indicate a profit motive. Dworshak v. Commissioner, T.C. Memo. 2004-249, slip op. at 10-11. While a taxpayer need not conduct a formal market study, a basic investigation of

**[*30]** the potential for profitability is indicative of a profit motive.  <u>Giles v. Commissioner</u>, slip op. at 31; <u>Wesinger v. Commissioner</u>, slip op. at 18-19.

Petitioner presented no evidence that he conducted a basic investigation of the potential profitability of his horse racing activity.  Moreover, petitioner did not show that he consulted with experts on the operation of a horse racing activity.  Although he associated with horse trainers and pony riders in the operation of his horse racing activity, there is no evidence in the record to suggest that petitioner discussed with these individuals how to run a profitable horse racing activity.  Petitioner hired an accountant, in part for advice about keeping records, but, as discussed <u>supra</u>, he did not use his records to cut expenses, generate or increase profits, or evaluate the overall performance of his horse racing activity.  Therefore, this factor supports a finding that petitioner did not have the requisite profit motive.

C.     <u>Conclusion</u>

After considering all the facts and circumstances, we conclude that petitioner did not engage in his horse racing activity during the years at issue with the predominant, primary, or principal objective of making a profit independent of the tax savings.  <u>See</u> <u>Wolf v. Commissioner</u>, 4 F.3d at 713.  We therefore sustain respondent's determination with respect to petitioner's horse racing activity.

**[\*31]** II.     Petitioner's Claimed Deductions

Because we conclude that petitioner's horse racing activity is not an activity engaged in for profit for the years at issue, he may deduct expenses paid with respect to his horse racing activity only to the extent of his horse racing income and only as "Other Miscellaneous Deductions" on Schedules A, Itemized Deductions.  See sec. 183(b).  Because respondent has conceded that petitioner has substantiated horse racing expenses in amounts greater than his horse racing income for each year at issue, we do not address respondent's alternative argument that petitioner did not substantiate his reported horse racing expenses.

Petitioner also claimed cash and noncash charitable contribution deductions for each of the years at issue.  Section 170(a)(1) allows a deduction for contributions to charitable organizations defined in section 170(c).  Section 170(f)(8) provides substantiation requirements for certain charitable contributions.  Specifically, section 170(f)(8)(A) provides that "[n]o deduction shall be allowed under subsection (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of subparagraph (B)."  For donations of property other than cash the donee's written acknowledgment must include a description of the property contributed, indicate

[*32] whether the donee organization provided any goods or services in consideration for the contribution, and provide a description and good-faith estimate of the value of any goods or services that the donee organization provided. See sec. 170(f)(8)(B); sec. 1.170A-13(f), Income Tax Regs.

Petitioner testified generally that he made annual donations of clothing and small appliances worth approximately $500 to Goodwill during the years at issue. He did not provide any receipts or documentation for the contributions to Goodwill in 2010 or 2011. The Goodwill receipt dated October 10, 2012, did not describe the contributed items or the value of any items. Moreover, petitioner did not submit any credible evidence regarding his alleged cash contributions of $250 for each year at issue. We sustain respondent's disallowance of petitioner's charitable contribution deductions.

III.    Accuracy-Related Penalties

Respondent determined that petitioner is liable for accuracy-related penalties pursuant to section 6662(a) for the years at issue. Section 6662(a) authorizes the Commissioner to impose a 20% penalty on an underpayment of tax that is attributable to, among other things, (1) negligence or disregard of rules or regulations within the meaning of section 6662(b)(1); or (2) any substantial understatement of income tax within the meaning of section 6662(b)(2). A

[*33] substantial understatement of income tax is defined as an understatement that exceeds the greater of $5,000 or 10% of the income tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to accuracy-related penalties. Sec. 7491(c). This burden is satisfied if the Commissioner comes forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty. Higbee v. Commissioner, 116 T.C. at 446. Respondent determined that petitioner should have reported $37,956, $28,432, and $33,484 of tax on his 2010, 2011, and 2012 Federal income tax returns, respectively. Respondent also determined that petitioner understated his income tax by $29,212, $25,486, and $25,023 for tax years 2010, 2011, and 2012, respectively, all of which are greater than $5,000, which in turn is greater than 10% of the income tax required to be shown on the return for the years at issue. Even with concessions regarding expenses, the understatements of income tax still exceed the greater of $5,000 and 10% of the tax required to be on shown on the returns for the tax years at issue. Respondent has carried his burden to show petitioner substantially understated his income tax for the years at issue.

Petitioner is therefore liable for the accuracy-related penalties unless he can show that he had reasonable cause for and acted in good faith with respect to each

**[\*34]** of the underpayments. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. For purposes of section 6664(c), a taxpayer may establish reasonable cause and good faith by showing reliance on professional advice. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer relies reasonably on professional advice if he proves the following by a preponderance of the evidence: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Rule 142(a).

Since 1992, in response to an IRS audit of his return, petitioner has hired an accounting firm that specializes in horse racing accounting for advice about recordkeeping with respect to his horse racing activity and to prepare his Federal tax returns. For each taxable year, petitioner filled out the accountant-provided worksheet detailing his horse racing expenses and mailed the worksheet with supporting documentation. Petitioner relied on the advice of his accountant regarding the deductibility of his horse racing expenses. We find that petitioner had reasonable cause and good faith with respect to the underpayments insofar as they relate to his horse racing activity. However, nothing in the record suggests

**[*35]** that petitioner had reasonable cause or good faith with respect to his claiming the cash and noncash charitable contribution deductions for the years at issue, and we find him liable for the accuracy-related penalties under section 6662(a) insofar as they relate to underpayments attributable to the claimed charitable contribution deductions.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.