PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-1501, 22-1502, and 22-1503
_____

MITCHEL SKOLNICK; LESLIE SKOLNICK,
                              Appellants in No. 22-1501

v.

COMMISSIONER OF INTERNAL REVENUE
_____

MITCHEL SKOLNICK; BRIANNA SKOLNICK,
                              Appellants in No. 22-1502

v.

COMMISSIONER OF INTERNAL REVENUE
_____

ERIC FREEMAN,
                              Appellant in No. 22-1503

v.

COMMISSIONER OF INTERNAL REVENUE
_____

On Appeal from the United States Tax Court
(IRS Nos. 16-24649, 16-24650, 16-24980)
Tax Court Judge: Honorable Albert G. Lauber
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 30, 2023

Before: HARDIMAN, KRAUSE, and MATEY, *Circuit Judges*.

(Filed:  March 8, 2023)

Bryan E. Bloom
Kevin H. DeMaio
Faegre Drinker Biddle & Reath
600 Campus Drive
Florham Park, NJ 07932

B. Paul Husband
Law Offices of B. Paul Husband
101 South First Street
Suite 202
Burbank, CA 91502

Richard W. Craigo
10724 Wilshire Boulevard
Suite 406
Los Angeles, CA 90024

   *Counsel for Appellants*

David A. Hubbert
Janet A. Bradley
Joan I. Oppenheimer
United States Department of Justice
Tax Division
Room 4738
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge.*

Mitchel Skolnick, Leslie Skolnick, Brianna Skolnick, and Eric Freeman (collectively, Taxpayers), appeal an order of the United States Tax Court. They argue the Court clearly erred when it held their horse activity—undertaken through Bluestone Farms, LLC (the Company)—was "not engaged in for profit" under § 183 of the Internal Revenue Code. Taxpayers also claim the Court erred when it held they could not carry forward net operating losses (NOLs) allegedly arising from their horse activity in prior years. After scrutinizing the Tax Court's comprehensive opinion, the record, and the briefs, we perceive no reversible error. We will affirm.

I

A

During the tax years at issue, 2010–2013, Mitchel Skolnick and Eric Freeman owned the Company, a horse farm in New Jersey. They bought, sold, bred, and raced Standardbred horses. Mitchel's first wife, Leslie, and his second wife, Brianna, are parties to the case only because they filed tax returns jointly with Mitchel. So we focus on the activities of Mitchel and Eric.

Mitchel received an undergraduate degree from Emory University in 1976 and an MBA from Adelphi University in 1986. He remained in Atlanta after college and worked briefly as an engineer in training. In 1978, he joined Solgar Co., Inc., a successful vitamin company his father Allen Skolnick operated. That same year, Allen took an interest in Standardbred horses, which led him and his wife to found Southwind Farms to start a breeding operation. In 1986, Mitchel started his own consulting firm and became involved in the Standardbred industry when Allen asked him to manage three horses. By 1996, Mitchel had retired from his consulting business and was working full-time at Southwind with Allen.

Eric graduated from Cornell in 1966 and earned an MBA from the University of Virginia two years later. His career focused mainly on insurance. Eric's clients included Southwind and Allen's other ventures. Allen introduced Eric to Standardbred horse breeding.

Around 1993, Eric asked Allen if he could get involved in the horse breeding industry. Allen invited Eric to join him, along with Mitchel, in the Chancery Equine Group, a syndicate

4

that enabled investors to purchase Standardbred horses. When Allen invited Eric to invest, he cautioned Eric that though he might lose all his money, he would at least meet people he would never meet otherwise. Eric called the predictions "prophetic."

Following disputes with his father, Mitchel left Southwind and the Chancery Group in 1998. Mitchel had discussed with Eric starting their own horse farm and they had created a business plan and a budget for the Company. They planned to buy and breed a stallion and to board other horses. To that end, they acquired 61 acres in Hopewell, New Jersey, not far from Southwind. They paid $559,000 for the property and called it Bluestone Farms.

By 2000, Mitchel did not have the money to pay for the Company's expenses, so Eric paid most of the bills while Mitchel returned to his consulting firm. That year, Mitchel and Eric crafted a second business plan, hoping to supplement the Company's income by winning horse races and breeder's awards. In 2001, the Company received $325,000 from a passive investor, Frank Russo, in exchange for a 15 percent interest. In 2002, the Company bought a 30-acre property, Wert Farm, for $850,000.

In 2003, the Company sold a conservation easement at Bluestone for $869,640. The same year, Mitchel retired from the consulting business again, and he and Eric developed a third business plan. They wrote a fourth (and final) business plan in 2004. Soon after, Mitchel began receiving millions of dollars from an irrevocable trust his parents created. In 2007, the Company purchased 200 acres near Bluestone (the Rosenthal Farm) for $4 million. Mitchel and Eric planned to expand operations with more broodmares at Rosenthal Farm,

but that effort was halted after New Jersey ceased using Atlantic City casino funds to subsidize racetracks. The Company was audited in 2008, but the Commissioner of Internal Revenue took no adverse action. By 2009, Mitchel had received about $10 million from his parents' trust.

B

During the tax years at issue (2010–2013) between 15 and 25 horses lived at Bluestone, Wert, and Rosenthal Farms at any given time. Other horses were boarded at out-of-state farms. The Company employed between seven and ten employees who assisted with the horses and organized the Company records. None of the employees had a budget. Taxpayers do not contest that they lost more than $3.5 million during the years at issue and more than $11.4 million between 1998 and 2013. *See Skolnick v. Comm'r*, 2021 WL 5936986, at *20 (T.C. Dec. 16, 2021).

Mitchel handled daily operations for the Company, including paying bills and monitoring the horse breeding process. Eric split his time between Florida and New Jersey, and handled the Company's insurance needs, but had little involvement in its day-to-day operations. Eric did, however, accompany horses to races and attended "pretty lavish parties." App. 972. Taxpayers contributed capital and made loans to the Company without differentiating between the two.

Over the years, Taxpayers increasingly focused on winning studs. The Company owned a 35% interest in a successful stallion, Always A Virgin, stabled in Indiana. In 2013, the Company bought for about $50,000 a 35 percent interest (later increased to 55 percent) in a horse sired by Always A Virgin called Always B Miki. Always B Miki earned

6

purses totaling $2.7 million from racing through his retirement in 2016 and generated substantial stud fees. In 2016, the Company sold interests in Always B Miki for nearly $1.2 million, enabling it to report a modest overall profit in that year.

During the tax years at issue, the Company responded to changes in the horse market. New Jersey stopped subsidies to racetracks and decreased the purse structures for breeder's awards. Meanwhile, Pennsylvania had tightened its requirements for awards by requiring breeders to locate mares in Pennsylvania for 180 days to maintain eligibility for state-sponsored races. So the Company continued its previous partnership with a Kentucky operation, Cane Run Farm, to board horses outside Kentucky, including in Pennsylvania, to capitalize on breeder's awards.

The Wert and Rosenthal Farms were never expanded to include additional mares, as originally planned. Mitchel and Eric tried to sell those properties in 2012 to a publicly traded home builder, Toll Brothers, but negotiations failed. When Mitchel and Eric were approached in 2013 about a purchase of the building rights on Wert and Rosenthal Farms, they declined the offer.

The Company also paid for many of Mitchel's personal expenses. Mitchel moved to Bluestone in 2008 after he separated from Leslie. Brianna began staying with him around 2009. Beginning in 2010, and for the rest of the years at issue, Mitchel and Brianna lived together rent-free in a renovated farmhouse at Bluestone. The Company paid to tear down and rebuild the farmhouse. By 2011, Brianna had a Company credit card that she sometimes used for personal expenses. The Company also paid for Brianna to keep her horses at Bluestone.

7

In 2013, Mitchel divorced Leslie and married Brianna. Mitchel admitted at trial that Company funds "definitely" paid for wedding expenses, including extensive landscaping. App. 790.

C

Mitchel filed joint tax returns with Leslie for 2010–2012, and with Brianna for 2013, claiming Company losses substantial enough to eliminate any income tax liability for those years. Eric also claimed losses and reported owing little or no taxes for the years at issue.

In 2016, the Internal Revenue Service sent notices of income tax deficiencies and penalties to Mitchel and Leslie for 2010–2012, Mitchel and Brianna for 2013, and Eric for 2010–2013. Taxpayers timely filed amended petitions in the United States Tax Court for a redetermination of the deficiencies and penalties.

After a five-day trial, the Tax Court sustained the deficiency determinations, holding that Taxpayers could not deduct Company losses because their horse breeding activity was not engaged in for profit under § 183 of the Internal Revenue Code. *Skolnick*, 2021 WL 5936986, at *22. The Court also held that Taxpayers failed to substantiate net operating loss carryforwards that allegedly arose from Company activity. *Id.* at *23. The Court further held that Mitchel and Leslie were liable for the late-filing penalty, but Taxpayers were not liable for the accuracy-related penalties. *Id.*

Under the final orders, the Skolnicks were liable for tax deficiencies for 2010–2013 of $282,036, $230,141, $189,077, and $174,664, respectively. Eric Freeman was liable for tax deficiencies of $52,421, $38,514, $39,478, and $21,385 for

8

those years. Mitchel and Leslie were also ordered to pay $67,026 for filing late in 2010. Taxpayers filed timely appeals and we consolidated the cases.

## II

The Tax Court had jurisdiction under 26 U.S.C. §§ 6214 and 7442. We have jurisdiction under 26 U.S.C. § 7482(a)(1). Venue was proper because, at the time they filed their petitions, Mitchel and Brianna resided in New Jersey, and Leslie resided in Pennsylvania. Eric resided in Florida, but the parties stipulated to venue in the Third Circuit for his appeal.

## III

The key issue on appeal is whether Taxpayers' horse activity was not engaged in for profit under § 183 of the Internal Revenue Code during 2010–2013. We review that factual determination for clear error. *Keating v. Comm'r*, 544 F.3d 900, 903 (8th Cir. 2008); *Comm'r v. Duberstein*, 363 U.S. 278, 291 & n.13 (1960). "[W]e affirm the court's finding so long as it is 'plausible'; we reverse only when 'left with the definite and firm conviction that a mistake has been committed.'" *Cooper v. Harris*, 581 U.S. 285, 309 (2017) (citation omitted).

Section 183(a) of the Internal Revenue Code provides that "[i]n the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed. . . ." 26 U.S.C. § 183(a). Treasury Regulation 1.183–2(b) lists nine non-exclusive factors to consider in determining whether an activity is engaged in for profit. They are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of

the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. 26 C.F.R. § 1.183–2(b). The inquiry is fact-driven and we give greater weight to objective facts than to intent. 26 C.F.R. §§ 1.183–2(a), (b). No one factor is determinative and the analysis does not depend on a preponderance of the nine factors. 26 C.F.R. § 1.183–2(b).

The Tax Court considered these factors and determined that Taxpayers did not conduct the Company's horse activity during 2010–2013 with a genuine intent to make a profit. *Skolnick*, 2021 WL 5936986, at \*12–22. Section 183 thus disallowed as deductions the losses that the Company passed through to them. In its analysis, the Court found that five factors—1, 6, 7, 8, and 9—favored the Commissioner. Three factors—3, 4, and 5—were neutral. And only factor 2 favored Taxpayers. We review these three groups in turn. Taxpayers dispute the Tax Court's analysis of every factor.

A. Factors Favoring the Commissioner

1

Because the history of income and losses (factor 6) was "by far" the most important to the Tax Court's analysis, we begin with that factor before discussing the other four that favored the Commissioner. *Skolnick*, 2021 WL 5936986, at \*20. And it weighed heavily against Taxpayers. *Id.* Between 1998 and 2013, the Company lost more than $11.4 million. The

10

Tax Court has held the start-up phase for horse activity is five to ten years. *Engdahl v. Comm'r*, 72 T.C. 659, 669 (1979). But the Company's losses continued essentially unabated after that timeframe. By 2010 the Company had been in operation for twelve years. Yet from 2010 through 2013, the Company lost more than $3.5 million.

Taxpayers point to profits the Company earned after the years at issue, emphasizing the success of Always A Virgin. But as the Tax Court noted, those profits occurred after the IRS selected Mitchel and Leslie's tax return for examination. So Taxpayers were motivated to generate a profit. *Skolnick*, 2021 WL 5936986, at *20. Taxpayers' arguments about their gross receipts also fall flat because they failed to measure them against their expenditures. *See Faulconer v. Comm'r*, 748 F.2d 890, 901 (4th Cir. 1984).

Taxpayers try to excuse the Company's lack of profit by citing adverse events beyond their control. The Tax Court acknowledged that the economic environment for Standardbred horses had declined and that a financial crisis occurred in 2008. *Skolnick*, 2021 WL 5936986, at *20. But the elimination of the New Jersey subsidy to the horse industry in 2012 "d[id] not explain the magnitude of [the Company's] loss in 2012 ($993,066) or the magnitude of its losses in earlier years when the subsidy existed." *Id*. Likewise, the Company's losses during the severe downturn in the economy from 2008–2010 ($3,063,893) were barely greater than its losses in 2011–2013 ($2,993,873), when the economy was recovering. *Id.* So the Tax Court did not clearly err when it found that adverse market conditions did not explain the Company's sustained unprofitability. The substantial history of losses strongly weighed against Taxpayers.

The Tax Court found that the way Taxpayers conducted their horse activity (factor 1) also strongly favored the Commissioner. *Skolnick*, 2021 WL 5936986, at *12–15. Taxpayers challenge this finding by citing their voluminous business records. The Tax Court acknowledged the records but identified significant inaccuracies and gaps in them. *Id.* at *12. For example, although the Company was founded in 1998, the initial operating agreement between Mitchel and Eric was dated 2001. At trial, Mitchel could not recall how much he or Eric had initially contributed to the Company or if their contributions were equal. Mitchel also testified that he and Eric did not distinguish between capital contributions and loans. In the same vein, important changes in the ownership interests of the Company were not memorialized until after the IRS began its examination.

Taxpayers claim the Court erroneously found that the regulation "requires" a plausible business plan. Taxpayers Br. 26 n.11. But the Court said no such thing. *Skolnick*, 2021 WL 5936986, at *12. The lack of a business plan after 2004, plus the lack of employee budgets, supported a finding that the horse activity was not conducted in a businesslike manner. Mitchel did not help his case either when he testified that cost-saving options suggested by staff were not a priority because he approached the Company "not so much in income and expenses." App. 910.

If that were not enough, the Company paid for personal expenses, including the Bluestone farmhouse reconstruction and landscaping for Mitchel's wedding. Brianna used a Company credit card for her personal expenses. Mitchel set aside the bills for the cost of boarding Brianna's horses and

Company staff widened the walking path for her. At trial, when asked about some of these costs, Brianna called them her "bar tab," but she could not say how much she owed. App. 1514–1515. Mitchel likewise testified: "it sounds like a lot of money, but . . . [Brianna is] my wife," although he was still married to Leslie when many expenses were incurred. App. 803, 806–811. The Tax Court did not err when it said that piling these costs onto Bluestone "sits uneasily" with claims that the Company operated with a profit motive. *Skolnick*, 2021 WL 5936986, at *14.

Taxpayers argue persuasively that the Court should not have substituted its own business judgment in evaluating how Mitchel and Eric responded to losses. *See Skolnick*, 2021 WL 5936986, at *15. Under the regulation, changing operating methods to respond to losses is evidence of a profit motive. 26 C.F.R. § 1.183–2(b)(1). Taxpayers responded to changes in breeder's award requirements, including by partnering with Cane Run and boarding their horses in other states. Even so, those actions were minor cost-saving measures that are not quite the "abandonment of unprofitable methods" contemplated by this part of the regulation. 26 C.F.R. § 1.183–2(b)(1). Despite the Tax Court's slight misstep, there remained sufficient evidence that the Company was not run in a businesslike manner. So the Court did not clearly err in weighing this factor in favor of the Commissioner.

Mitchel's and Eric's financial status (factor 8) also weighed strongly in the Commissioner's favor. *Skolnick*, 2021 WL 5936986, at *21. The Tax Court correctly considered Taxpayers' substantial income from sources other than the Company as evidence that their horse breeding activity was not engaged in for profit. Both the Skolnicks' and Eric's returns

13

during the years in question reported six-figure gross income from sources other than the Company.

Mitchel insists he did not invest in the Company for tax benefits, but the record suggests otherwise. The Company produced substantial tax benefits. Mitchel's income totaled $3.5 million, some $1.5 million of which was taxable. Mitchel argues that if he had been motivated by tax savings, "surely" he would have been "savvy enough" to switch his tax-exempt bonds to another investment. Taxpayers Br. 51. But the substantial annual Company losses for 2010–2013 reduced Taxpayers' income tax liabilities for those years to zero or close to it.

Taxpayers argue that any tax benefits were not dispositive. That's true, but the Tax Court did not rely on this factor alone. The tax benefits were real, they were significant, and the Court did not err in finding that factor 8 favored the Commissioner.

3

The last two factors that favored the Commissioner are the amount of occasional profits (factor 7) and the elements of personal pleasure or recreation (factor 9). Though we perceive some weaknesses in the Court's analyses of these factors, it placed little weight or emphasis on either one.

Taxpayers raise some persuasive challenges to the Tax Court's analysis of factor 7—the amount of occasional profits. There is some evidence the Court did not acknowledge. For example, Frank Russo's purchase of a 15 percent interest in the Company for $325,000 in 2001, although not generating an overall profit, was significant. Though Russo's investment did

14

not put the Company in the black that year, the Court could have cited the sale as evidence that the Company was a business. There was also the 2003 sale of a conservation easement for $869,640, which offset a $652,453 loss. Finally, there were profits in 2016 from the sale of the interest in Always B Miki. But even had the Court noted this income, it would not have tipped the balance in favor of Taxpayers. The income was appreciably less than the Company's consistent losses, which often exceeded $1 million a year. As the regulation states: "[a]n occasional small profit from an activity generating large losses . . . would not generally be determinative that the activity is engaged in for profit." 26 C.F.R. § 1.183–2(b)(7). And the profit generated from Always B Miki is tempered by the fact that it occurred after the tax years at issue and after Taxpayers received the notices of deficiency.

Factor 7 also accommodates speculative investments. The Tax Court acknowledged that it had "previously found certain horse activities—especially racing activities—to be highly speculative ventures, even likening them to wildcat oil drilling ventures." *Skolnick*, 2021 WL 5936986, at *20 (citing *Annuzzi v. Comm'r*, 2014 WL 5904717, at *12 (T.C. Nov. 13, 2014)). The Court then emphasized that the Company's efforts are in breeding, not racing. *Id.* Yet the Court ignored the possibility that breeding might be a speculative industry. At Southwind, for example, one horse drove farm profits. Mitchel also testified that "you raise several horses in the expectation that one of them will go on to be what Always B Miki is." App. 620. Still, the Court did not err in ultimately finding no hope of a big payout. The net profit from the sale of Always B Miki in 2016, for example, was $281,450, far below what was needed to offset the millions of dollars lost in prior years.

15

Taxpayers make another good point when they claim the Tax Court applied the wrong legal standard to factor 7. 26 C.F.R. § 1.183–2(b)(7). The Court did not think Taxpayers "entertained a reasonable belief, during 2010–2013, that the outsized success of a few horses would make Bluestone profitable overall." *Skolnick*, 2021 WL 5936986, at *21. But a "reasonable expectation of profit is not required." 26 C.F.R. § 1.183–2(a). The applicable standard is not whether Taxpayers had "a bona fide expectation" of profit, but whether they engaged in the activity with the "objective" of making a profit. *See Dreicer v. Comm'r*, 665 F.2d 1292, 1299–1300 (D.C. Cir. 1981) (quoting 26 C.F.R. § 1.183–2(a)). The statute bars deductibility of losses emanating from "'activities not engaged in for profit,' not activities lacking an expectation of profit." *Id.* (quoting 26 U.S.C. § 183). Despite this misstatement, the Tax Court did not clearly err in finding that factor 7 favored the Commissioner. As explained above, any profits, real or expected, were minimal compared to losses, even characterizing horse breeding as speculative. Although Taxpayers valiantly mined the record to show that the Court could have weighed the evidence differently, their evidence does not convince us that the District Court clearly erred.

Factor 9—elements of personal pleasure or recreation—favored the Commissioner. As the Tax Court has previously recognized, "[s]uccess in business is largely obtained by pleasurable interest therein." *Jackson v. Comm'r*, 59 T.C. 312, 317 (1972) (citation omitted). Still, "if the chance for profit is small relative to the potential for gratification, the latter may emerge as the primary motivation." *Annuzzi*, 2014 WL 5904717, at *13. Here, Taxpayers do not meaningfully resist the Court's analysis about Eric. But as to Mitchel, they insist there is no evidence he enjoyed the horse activity because he

never rode horses or had parties at Bluestone. The Commissioner argues that the Court based its finding on the *opportunity* to socialize. We agree with Mitchel on this point. The record does not support that the *prospect* of social opportunities mattered to Mitchel, notwithstanding his wedding party at Bluestone. We also agree with Mitchel that his enjoyment of the analytical approach to breeding supported the Company's profit motive.

We are unpersuaded, however, by Mitchel's argument that any benefits of his residence at Bluestone somehow discount his pleasure in living on the property. The record supports the Court's finding that the personal pleasure Mitchel derived from living at Bluestone outweighed the benefits that accrued to the Company. Mitchel moved to the farm in 2008 after he separated from Leslie. By 2010, he and Brianna were living together rent-free in the renovated farmhouse. Mitchel allowed Brianna to use the property to ride her horses and to use a Company credit card for personal expenses. He also arranged for substantial improvements to Bluestone before their wedding and derived pleasure from residing on the 61-acre estate. These personal motives suggest that Mitchel's operation of the Company was not for profit. On balance, we agree with the Court's finding that factor 9 favored the Commissioner.

## B. Neutral Factors

The Court deemed factors 3, 4, and 5 neutral. The Court and the parties spent more time evaluating factor 4—the expectation that the assets used in the activity may appreciate in value—so we focus on that factor first.

17

The Court found that the horse breeding operation and real estate holdings at Bluestone were interrelated. *Skolnick*, 2021 WL 5936986, at *18. It follows that Taxpayers' expectation that the original property would appreciate supported their profit motive. The same is not true, however, of the Wert and Rosenthal Farms. There was little horse activity on those farms. They were almost sold to Toll Brothers for housing development, but whatever appreciation might have occurred in that respect could not have supported the notion that the Company bred horses for profit.

As for the horses, the Court did not err when it found there was no plausible basis to find the Company's herd would meaningfully appreciate in value. *Skolnick*, 2021 WL 5936986, at *19. Even accepting Taxpayers' belief that Always B Miki would succeed, the Company lost more than $11 million on horse ownership between 1998–2013. Weighing the evidence of Mitchel's testimony against that of the IRS experts and the actual losses, we hold that the Court did not clearly err in discounting any expectation of the horses appreciating in value.

We agree with the Tax Court that this factor was neutral because that expectation does not support a finding that the horse activity as a whole was conducted with a genuine intent to make a profit.

We address factors 3 and 5 only briefly. Factor 3—the time and effort expended—was not meaningfully disputed by Eric, presumably because his involvement in the Company was minimal. Not so for Mitchel, who worked eight to nine hours a day, five to six days a week. Taxpayers rightly note that considerable hours spent on an activity might reflect a profit motive. But hours alone are not necessarily enough to find that

18

this factor must favor a taxpayer. *See, e.g.*, *Betts v. Comm'r*, 2010 WL 2990300, at \*9 (T.C. Jul. 27, 2010) (although Betts spent a "significant amount of time on her horse activity," the "many personal and recreational aspects" made the factor neutral). Here the Tax Court acknowledged Mitchel's time, but also credited the testimony of Company employees that he was not much of a hands-on manager. *Skolnick*, 2021 WL 5936986, at \*16. The evidence here is equivocal, so the Court did not clearly err.

Taxpayers rightly note that "withdrawal from another occupation to devote most of his energies to the activity" may suggest that the activity is engaged in for profit. 26 C.F.R. § 1.183–2(b)(3). Mitchel and Eric stopped working at their other jobs before working for the Company. And even after Mitchel went back to work at his consulting firm to help pay the Company's bills, his second retirement coincided with his anticipated receipt of millions of dollars of trust funds. The Court did not clearly err in finding factor 3 to be neutral either.

As for factor 5—success in similar activities— Taxpayers showed no meaningful synergy between their past business activities and their horse breeding operation. The Court did not err in finding this factor neutral.

## C. Factor Favoring Taxpayers

Factor 2—the expertise of Taxpayers and their advisors—was the only one that favored Taxpayers. *Skolnick*, 2021 WL 5936986, at \*16. Both Mitchel and Eric had experience in the horse breeding industry dating back to their work with Southwind and the Chancery Equine Group. The Tax Court credited that experience. *Skolnick*, 2021 WL 5936986, at \*16. Taxpayers argue that their experience should

have been given more weight. But the case they cite did not give this factor significant weight. *See Den Besten v. Comm'r*, 2019 WL 6312955, at *9 (T.C. Nov. 25, 2019).

Mitchel and Eric also consulted experts in the industry. But for § 183 purposes, that counts only if the expert advice advances the profit motive. *See Whatley v. Comm'r*, 2021 WL 289333, at *7 (T.C. Jan. 28, 2021). Taxpayers did not reveal what type of advice they sought from their advisors. So the Court did not err in giving little weight to the consultation of experts. As the Court noted, hobbyists "often seek expert advice" about their interests. *Skolnick*, 2021 WL 5936986, at *16. And even if this factor were afforded more weight, it would have done little to alter the balance of all the other factors.

\* \* \*

In sum, the Tax Court did not clearly err in finding that Taxpayers' horse activity during 2010–2013 was "not engaged in for profit" under § 183.

IV

Taxpayers also sought to carry forward net operating losses generated by the Company in the years prior to 2010 to shelter future investment income, including the deficiencies at issue. *See* 26 U.S.C. § 172(b)(1)(A). Contrary to Taxpayers' unsupported claim that the NOL determination is a legal question, we consider it a matter of fact and agree with our sister courts that we review the sufficiency of evidence submitted for tax deductions for clear error. *See, e.g.*, *Buelow v. Comm'r*, 970 F.2d 412, 415 (7th Cir. 1992) ("The tax court's determination that a taxpayer has failed to come forward with

20

sufficient evidence to support a deduction is a factual finding"); *Thompson v. Comm'r*, 631 F.2d 642, 646 (9th Cir. 1980), *cert. denied*, 452 U.S. 961 (1981).

The first two pieces of evidence submitted—the income tax returns—are insufficient because Taxpayers cannot rely solely on their own returns to establish losses. *Roberts v. Comm'r*, 62 T.C. 834, 837 (1974).

Taxpayers insist that their third piece of evidence—the IRS's No Change letter submitted in 2010 after the audit of their 2008 tax returns—makes this case unique. We disagree. The audit and letter did not address whether Taxpayers operated the Company intending to make a profit. The letter simply says the Internal Revenue Agent proposed no changes to their 2008 tax return. App. 5633. Again, tax returns cannot establish losses on their own. And the claimed NOLs were from more years than just the audit year (2008), and each tax year stands on its own. *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969).

Taxpayers also failed to submit ledgers from the years prior to 2010 in which the asserted NOLs occurred. The last piece of evidence Taxpayers submitted were the general ledgers from the years 2010–2013. Recognizing their error in not submitting more evidence, Taxpayers moved to add evidence five months after the record was closed. The Tax Court denied that motion as untimely and Taxpayers have not challenged that order.

For the reasons stated, the Tax Court did not clearly err in denying the NOL carryforward deductions.

V

Mitchel and Leslie claim that any finding in their favor on the prior two issues will eliminate their late-filing penalty for 2010 under 26 U.S.C. § 6651(a)(1). They forfeited this argument by only raising it in a footnote. *See United States v. Centeno*, 793 F.3d 378, 388 n.9 (3d Cir. 2015). They also cited no law to support their legal claim. So Mitchel and Leslie remain liable for the penalty.

\* \* \*

The Tax Court adeptly conducted the five-day trial and issued a comprehensive opinion. At most, Taxpayers have shown that the Tax Court could have weighed the evidence differently. Because more is necessary to show clear error, we will affirm the decision.