# United States Tax Court

T.C. Memo. 2026-13

JAMES D. SULLIVAN AND COLLEEN M. SULLIVAN,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 15625-22. Filed February 5, 2026.

————

*David A. Goldman*, *Daniel L. Cummings*, and *John. W Geismar*, for petitioners.

*Michael E. D'Anello*, *Heather H. Lee*, *John F. Patton*, and *April A. Weeks*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*: Pursuant to section 6213(a),[1] petitioners, James and Colleen Sullivan, seek redetermination of deficiencies in federal income tax determined by the Internal Revenue Service for the 2017 through 2019 taxable years (years at issue). After concessions the issues that remain in dispute are whether (1) petitioners' activities associated with Traders Abacus, LLC (Traders Abacus), including software development and home construction, for all years at issue were engaged in for profit under section 183, (2) petitioners' activities associated with Leaf-Cutter, an assumed name for a purported mulching business, in tax year 2019 were engaged in for profit under section 183; and

—————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]** (3) petitioners are liable for accuracy-related penalties for 2018 and 2019 under section 6662(a).[2]

Trial was held in this case only on the issue of whether the Sullivans engaged in the disputed activities for profit. Whether the Sullivans substantiated the expenses claimed from those activities and are liable for section 6662(a) penalties will be addressed in subsequent proceedings to the extent necessary. For the reasons set forth below, we hold that the Sullivans engaged in the Traders Abacus software development activities for profit, that they engaged in the Traders Abacus home construction activities, in part, for profit, and that they did not engage in the Leaf-Cutter mulching business for profit. Accordingly, the Sullivans are entitled to deduct business expenses incurred in these activities from 2017 to 2019, to the extent they are later substantiated, as set forth below.

FINDINGS OF FACT

The trial in this case took place during a Boston, Massachusetts, trial session. We incorporate by this reference the First Stipulation of Facts, as amended, the First Supplemental First Stipulation of Facts, and any Exhibits admitted at trial. The Sullivans resided in Maine when they timely filed their Petition.

I.   *Petitioners' Background, Work Experience, and Home Construction Experience*

The Sullivans did not attend college, but they are intellectually curious people and have extensive, self-taught knowledge and experience in various fields. Before their marriage, Mr. Sullivan began his career installing hardware for telecommunications systems.

The Sullivans were married in 1980 and moved to Minnesota in 1981. They have four children. While living in Minnesota, Mr. Sullivan worked first as a staff engineer and then as director of engineering for two cable television companies where he first gained experience with cable-based advertising.

In or around 1985, the Sullivans began building a house that they intended to be their primary residence while living in Minnesota. Mr.

---

[2] Respondent conceded that petitioners are not liable for an accuracy-related penalty for taxable year 2017. Still at issue is whether petitioners are liable for accuracy-related penalties for the 2018 and 2019 taxable years.

[*3] Sullivan oversaw subcontractors, and Ms. Sullivan did landscaping and general design work, and kept the site clean. The Sullivans operated heavy equipment while working on the Minnesota residence. They sold their Minnesota residence for a profit when they moved to Montana.

In 1987, the Sullivans moved to Montana as part of Mr. Sullivan's plan to launch North Broadcasting, a television station business for which he had developed a business plan and raised funding while living in Minnesota. Ultimately, North Broadcasting was never launched because Mr. Sullivan's business partner backed out.

Before moving to Montana, the Sullivans purchased 20 acres of land in Montana on which they intended to build their primary residence. In the course of building the Montana residence, the Sullivans again managed subcontractors, performed architectural and design work, operated heavy equipment, and completed various construction-related tasks such as landscaping, masonry, carpentry, and painting. The Sullivans sold their Montana residence at a loss when they moved to the east coast.

In 1989, the Sullivans moved to Connecticut when Mr. Sullivan accepted a job with Channelmatic as a traveling salesman of computer equipment used to run television advertisements. A year later, the Sullivans moved to Massachusetts when Mr. Sullivan started a different job as general manager for Media Partners, a cable company in Boston, Massachusetts. Then in 1993 or 1994, Mr. Sullivan was hired by Continental Cable to serve as its director of engineering and operations. His work with Continental Cable included facilitating installation of infrastructure necessary to provide the first cable modem internet access in and around Boston. Mr. Sullivan left his role with Continental Cable in 2003.[3]

The Sullivans rented for nearly ten years after moving to the east coast, but in 1999 they decided to purchase a home in Hingham, Massachusetts (Hingham residence). The Hingham residence was a historic home and was in a state of disrepair. The Sullivans completed significant repairs, renovations, and additions to the home. Mr. Sullivan once again managed subcontractors, operated heavy machinery, and performed architectural and design work; and the Sullivans completed various construction tasks such as painting, installing windows, and

---

[3] By this time Continental Cable had been the subject of a series of mergers and acquisitions and was a business unit of Comcast.

[*4] building stairs. In 2018 they sold the Hingham residence for $1.35 million, which was $350,000 more than the original purchase price.

In or around 2005, following a break from regular employment to pursue Traders Abacus's first endeavor, Mr. Sullivan accepted a role as the senior director of product marketing for Open TV, a company that developed software used in planning and playing television advertisements. His role with Open TV involved significant travel to attend trade shows and meet with customers and other industry participants. In or around 2009, Mr. Sullivan became a senior director of sales with Open TV.

Imagine Communications (Imagine) acquired Open TV in 2014 and employed Mr. Sullivan through the years at issue. Mr. Sullivan's compensation in his sales role with Imagine was partially commission based, and in some years he outearned the company's chief executive officer. In 2014, Mr. Sullivan and Imagine entered into an agreement that protected Mr. Sullivan's rights to ownership of intellectual property relating to his software development ventures.

Mr. Sullivan served as Imagine's vice president of sales in 2017, 2018, and, following a brief stint as the vice president of strategy in early 2019, during the latter half of 2019. He earned $355,734, $178,332, and $226,857 in taxable wages from Imagine in 2017, 2018, and 2019, respectively. Ms. Sullivan did not work outside the home at any time during the years at issue.

II.    *Traders Abacus's Activities*

A.    *Software Development*

Mr. Sullivan incorporated Traders Abacus as a single-member limited liability company in or around 1995. In 2003, after a corporate reorganization led Mr. Sullivan to leave his job with Continental Cable, he began pursuing various independent projects. Mr. Sullivan was Traders Abacus's sole owner during the tax years at issue.

Traders Abacus's first endeavor in 2003 was to develop software that uses stock market data to assist traders of equity securities. Traders Abacus employed software programmers to develop the trading software and partnered with a Chicago-based equities trading firm that funded an account to test the software. In 2005, after 18 unprofitable

**[*5]** months, Mr. Sullivan abandoned his pursuits with respect to trading software.

In 2009, the Sullivans revived Traders Abacus to invest in Ms. Sullivan's music career. Ms. Sullivan is a talented musician, and the Sullivans reported $30,493 of expenses that they claim she incurred recording an album. Traders Abacus never earned a profit from its recording activities.

In 2013 or 2014,[4] while working for Imagine, Mr. Sullivan revived Traders Abacus once again to develop an internet-based application to address what Mr. Sullivan perceived as the overwhelming use of internet pornography. His perception was based on his experience working for Continental Cable, where he learned that approximately half of internet bandwidth was used for accessing pornography. Mr. Sullivan also conducted surveys and read published research articles to learn about the addictive nature of pornography.

Mr. Sullivan spent considerable time and money over the course of 2015 and 2016 in his attempt to develop and monetize an application that eventually took the name SelfChanger.[5] Mr. Sullivan researched therapeutical methods that he could implement in SelfChanger. He also hired individuals experienced with using TensorFlow, a program that supports machine learning, that could assist in creating software that would enable computers to read psychological interviews and generate responsive therapeutic scripts. Mr. Sullivan halted the development of SelfChanger in 2016 because he believed that the technology was not advanced enough to smoothly automate a patient's interactions with his addiction therapy application.

Mr. Sullivan was not actively pursuing the development of SelfChanger in 2017. In 2018, he reengaged his development efforts with respect to SelfChanger, and he funded the renewed effort from the sale of the Hingham residence, his wages from Imagine, and his retirement savings. In his renewed efforts, Mr. Sullivan sought to simplify the technology supporting the application by drafting content manually rather than using machine learning.

---

[4] The record reflects that Traders Abacus was dormant from 2009 to late 2013.

[5] Mr. Sullivan's pornography addiction therapy application took many different names. Its first name was WAY, short for Who Are You. Then it was known as PornHabit and then SelfChanger. We will refer to the application as SelfChanger.

**[\*6]**  Mr. Sullivan worked approximately 20 hours per week on his renewed efforts to develop SelfChanger, including continuing his research by reading published research on psychiatric treatment methods and meeting with subject matter experts. Notably, he studied and sought to implement the "five factors of personality" concept into the application to accurately assess the personality type of prospective patients and deliver a more tailored therapy experience.

In March 2019, Traders Abacus hired its first employee, Emily Sirianni, to assist with the development of SelfChanger. Ms. Sirianni holds a degree in sociology. Mr. Sullivan believed her to be a talented artist with a grounded personality; qualities that he valued for a project addressing a difficult and personal subject. Ms. Sirianni and Mr. Sullivan continued surveying potential customers to inform their product design choices, and they each developed written and visual content for the application. Traders Abacus paid Emily Sirianni $10,354 in wages in 2019.

Also in 2019, Mr. Sullivan generated a business plan for SelfChanger. The business plan contains his thoughts on the scope of the addressable market, the psychiatric methods he sought to employ, and a marketing-to-monetization strategy. Mr. Sullivan purchased advertising space on popular pornography websites with the goal of steering traffic to SelfChanger. The business plan also included results of surveys regarding potential consumers' pornography consumption habits. Further, Mr. Sullivan generated financial projections for the monetization of the SelfChanger application. His activities pertaining to SelfChanger generated no income from 2013 to 2019.

Throughout the years at issue, Traders Abacus maintained a general ledger and its own bank account separate from the Sullivans' personal accounts. The Sullivans regularly made transfers between their personal bank accounts and the business's account. Occasionally they used Mr. Sullivan's personal credit card for Traders Abacus-related transactions.

Early prototypes of the SelfChanger application were functional during the first quarter of 2020. Also around this time, Mr. Sullivan hired two full-time software engineers to further develop the application. With the help of the software engineers, Mr. Sullivan revamped what he called an ungraceful "scratch version" of the application into a smoother, more user-friendly iteration of the application using Amazon Web Services.

[*7]   Mr. Sullivan initially sought to monetize SelfChanger through the solicitation of donations from the application's users. When this proved unsuccessful, Mr. Sullivan pivoted to a subscription-based model. Mr. Sullivan offered subscriptions to SelfChanger for $9.99 per month, which would result in $5.95 of profit to Traders Abacus.

Mr. Sullivan once again halted development of SelfChanger in early 2022. He ceased operations because of an inability to retain customers. As of the time of trial, Mr. Sullivan had reduced SelfChanger's operating expenses to $35 per month to keep it active in case he developed a new monetization strategy.

B.   *Development of the Lincolnville Lot*

In or around 2017, the Sullivans began searching for property along the eastern seaboard on which they could develop a small group of "passive homes"—homes that require minimal energy to operate and do not need to be connected to the electricity grid. The Sullivans were drawn to an approximately 51.6-acre lot in Lincolnville, Maine (Lincolnville lot), because of its size, price, access to Boston, and frontage on Route 1.

Pursuant to a pre-existing division, the Lincolnville lot comprised two parcels: a 47.71-acre parcel and a 3.89-acre parcel. On October 13, 2017, the Sullivans personally, and through Traders Abacus, agreed to purchase the Lincolnville lot for a total purchase price of $300,000, subject to certain contingencies.

On December 27, 2017, the seller of the Lincolnville lot executed two warranty deeds, one with the Sullivans with respect to the 47.71-acre parcel, and one with Traders Abacus with respect to the 3.89-acre parcel. The Sullivans closed on the sale of the Lincolnville lot on February 8, 2018. The Sullivans and Traders Abacus each paid $150,000 for their respective parcels of the Lincolnville lot. On or around February 8, 2018, the Sullivans and Traders Abacus took out a mortgage for the purchase of the Lincolnville lot using the lot as collateral.

In December 2017, the Sullivans purchased a Bobcat excavator and a track loader to use on the Lincolnville lot. As part of the purchase process, the Sullivans received online and in-person safety and maintenance training specific to the machines they were purchasing. The Sullivans took delivery of the excavator and the track loader at the dealership in December 2017 and moved the equipment from the dealership to the Lincolnville lot in February 2018. Also in late 2017,

[*8] the Sullivans purchased numerous shipping containers for use in the development. When not in use, the Sullivans stored the heavy equipment and the containers on the 47.71-acre parcel of the Lincolnville lot to conceal them from the main road. Before moving to the Lincolnville lot, the Sullivans used the shipping containers to store personal items.

Before closing, the Sullivans performed certain acts of due diligence on the Lincolnville lot. First, they engaged an engineering firm, Gartley and Dorsky, to investigate the status of wetlands present on the property and to identify appropriate locations for septic tanks in order to assess its development potential. Second, the Sullivans pursued, and received on December 17, 2017, a highway entrance permit waiver from the State of Maine Department of Transportation. Additionally, they extensively researched the applicable rules and regulations, and maintained good relationships with Lincolnville town officials, to ensure that their plans for development were in compliance with local bylaws.

Throughout the years at issue, the Sullivans devoted most of Mr. Sullivan's salary to the development of the Lincolnville lot. The Sullivans also drew upon their retirement savings and forwent spending money on recreational pursuits or saving for retirement to further fund the project.

The Sullivans worked weekends on the Lincolnville lot before moving to it full time in August 2018. The Sullivans lived a spartan existence on the Lincolnville lot; they slept in a pop-up tent with an electric blanket and used the bathroom and shower facilities at a nearby YMCA. In spring 2019, the Sullivans set up a more robust tent that featured basic amenities. The Sullivans lived in this tent year round from June 2019 until January 2025.

The Sullivans also hired laborers in connection with their home construction activities. In or around 2018, they hired Wyatt Porter to work on Ms. Sullivan's grounds crew. Vincent Kwialkowski was also a member of their grounds crew, and the Sullivans reported that they paid him $280 in wages by check in 2019. Randall Rowling was a field crew laborer, and the Sullivans reported that they paid him $4,864 in wages by check in 2019. Each employee submitted his timesheet through Gusto, a payroll processing software used by the Sullivans.

**[\*9]**      1.     *The 3.89-Acre Parcel*

On April 9, 2018, Mr. Sullivan submitted a land use application to the Town of Lincolnville with respect to the 3.89-acre parcel owned by Traders Abacus. On the application, he described the proposed project as consisting of a residence, a barn, and six temporary storage units. On the application he indicated that the proposed project was not a commercial building. A related wastewater disposal system application, dated April 2, 2018, indicates that the Sullivans sought a system to serve a four-bedroom, single-family dwelling.

Mr. Sullivan viewed the proposed residence and barn project as a temporary reprieve from the less-than-ideal conditions of living in their camp. However, rising building material prices put the project financially out of reach for the Sullivans, and they ultimately never built the proposed residence or barn. They continued residing on the 3.89-acre parcel until they moved in January 2025.

2.     *The 47.71-Acre Parcel*

From 2017 to 2019, Ms. Sullivan led the Sullivans' efforts to develop the 47.71-acre parcel. Ms. Sullivan operated the Bobcat equipment to clear the land and mulch trees, build access roads, dig trenches, install a septic system, and clear debris. She worked outside with the Bobcat equipment nearly every day, including birthdays, anniversaries, and holidays, sometimes working over ten hours in a day. Further, she joined the Maine Forestry Owners' Association, which provided helpful information specific to forestry work under local conditions.

In spring 2018, the Sullivans identified a location for Traders Abacus's office on the 47.71-acre parcel. However, they did not begin construction of the office until 2019. Mr. Sullivan designed the office to be built by bolting together two modified shipping containers and obtained the necessary building permits. He ultimately moved Traders Abacus into the office in early 2020.

Ultimately, the passive homes never materialized. The Sullivans' development efforts with respect to the 47.71-acre parcel culminated in the construction of access roads on the property. In January 2025, the Sullivans sold the 47.71-acre parcel of the Lincolnville lot for $565,000.

**[*10]**  C.    *Leaf-Cutter*

Starting in or around 2019, Ms. Sullivan decided to use the Bobcat excavator that they purchased to develop the Lincolnville lot to operate a landscaping and mulching business under the name Leaf-Cutter. Leaf-Cutter was not a separate entity; it was only a name under which Ms. Sullivan operated the mulching business. Ms. Sullivan did not keep track of the time she spent on Leaf-Cutter activities during 2019.

Mr. Sullivan handled Leaf-Cutter's finances, which included maintaining a general ledger. Leaf-Cutter used Traders Abacus's tax identification number and bank accounts, but activities attributable to Leaf-Cutter consisted exclusively of forestry management and development, including Ms. Sullivan's purported mulching business. After a couple of safety-related incidents, the Sullivans resolved that the mulching attachment on the excavator was not safe, and they abandoned the mulching business venture.

D.    *Traders Abacus Tax Reporting*

For each tax year at issue, the Sullivans filed Schedule C, Profit or Loss From Business, for Traders Abacus. The Sullivans identified design and management as Traders Abacus's principal business or profession for each year at issue. They reported that Traders Abacus incurred the following expenses:

**[\*11]**

| Category | 2017 | 2018 | 2019 |
|---|---|---|---|
| Advertising | $3,512 | $2,077 | $5,033 |
| Car and truck expenses | 7,091 | — | — |
| Contract labor[6] | — | 25,878 | 158 |
| Depreciation and section 179 expense deduction | 268,879 | 110,253 | 50,039 |
| Insurance | — | 4,965 | — |
| Other interest | 10,737 | 4,160 | 3,529 |
| Legal and professional services | 6,021 | 1,150 | 5,486 |
| Office expenses | 1,060 | 28 | — |
| Rent or lease | — | 1,047 | — |
| Repairs and maintenance | 4,865 | 22,949 | 2,346 |
| Supplies | 2,816 | — | 954 |
| Taxes and licenses | — | 2,250 | 1,913 |
| Travel | 970 | — | — |
| Deductible meals | — | — | 59 |
| Utilities | 371 | — | 1,786 |
| Wages | — | — | 16,293 |
| Other expenses | 448[7] | — | 7,388[8] |
| **Total** | **$306,770** | **$174,757** | **$94,984** |

The Sullivans filed a separate Schedule C for Leaf-Cutter with their 2019 Form 1040, U.S. Individual Tax Return. On that Schedule C the Sullivans reported that the business incurred $87,550 of expenses for 2019, consisting of $26,358 in contract labor, $2,623 in insurance, $4,776 in other interest, $902 for repairs and maintenance, $39,970 in supplies, $8,932 in utilities, and $3,989 in other expenses.[9]

---

[6] The parties do not dispute that Traders Abacus paid $25,878 and $158 in contract labor expenses during 2018 and 2019, respectively.

[7] The Sullivans reported that Traders Abacus incurred $448 of other expenses for "fedex" for 2017.

[8] The Sullivans reported that Traders Abacus incurred $1,012 and $6,376 of other expenses for "due/subscription/fees" [sic] and "Web Software & Apps Expense," respectively, for 2019.

[9] The Sullivans reported that Leaf-Cutter incurred $185 and $3,804 of other expenses for "Bank Charges & Fees (LD)" and "De Minimis 1.263(a)-1(f) Tools & Equipment under $2,500 (LD)," respectively, in 2019.

**[\*12]** OPINION

I. *Burden of Proof*

The determinations in a notice of deficiency bear a presumption of correctness, *see Welch v. Helvering*, 290 U.S. 111, 115 (1933), and the taxpayer generally bears the burden of proving them erroneous in proceedings in this Court, *see* Rule 142(a)(1). The taxpayer also bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* § 6001; *Interex, Inc. v. Commissioner*, 321 F.3d 55, 58 (1st Cir. 2003), *aff'g* T.C. Memo. 2002-57; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

II. *Evaluation of Evidence*

In deciding whether taxpayers have carried their burden of proof, witness credibility is an important consideration. *Ishizaki v. Commissioner*, T.C. Memo. 2001-318, 2001 WL 1658189, at \*7. "[T]he distillation of truth from falsehood . . . is the daily grist of judicial life." *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972). "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." *Kropp v. Commissioner*, T.C. Memo. 2000-148, 2000 WL 472840, at \*3.

Generally, we found the Sullivans' testimony to be credible. On the basis of our evaluation of their demeanor at trial, we found much of their testimony plausible. We found Mr. Sullivan to be an intellectually curious man with diverse talents and interests. He and Ms. Sullivan each have a strong work ethic; they presented a wholesome profile.

III. *Profit Motive in Petitioners' Activities*

A. *Analytical Framework*

Generally, the Code allows deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business or for the production of income. §§ 162(a), 212(1). Section 183(a) provides generally that, if an activity is not engaged in for profit, "no deduction attributable to such activity shall be allowed," except as

**[\*13]** provided in section 183(b). *Filios v. Commissioner*, 224 F.3d 16, 21 (1st Cir. 2000), *aff'g* T.C. Memo. 1999-92. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

"The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case." *Estate of Power v. Commissioner*, 736 F.2d 826, 830 (1st Cir. 1984) (quoting Treas. Reg. § 1.183-2(a)). The factors listed in Treasury Regulation § 1.183-2(b) are relevant to an analysis of whether a taxpayer engages in activity with the objective of realizing a profit. *Filios v. Commissioner*, 224 F.3d at 21. The factors are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *See* Treas. Reg. § 1.183-2(b).

These factors are nonexclusive, and no one factor—or number of factors—is dispositive. *Filios v. Commissioner*, 224 F.3d at 21. Instead, all facts and circumstances must be considered, and more weight may be given to some factors than to others. *Id.* We accord greater weight to objective facts than to subjective statements of intent. Treas. Reg. § 1.183-2(a). The taxpayer bears the burden of proving that the activity was engaged in for profit. *Estate of Power v. Commissioner*, 736 F.2d at 828 (citing *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), *aff'd*, 647 F.2d 170 (9th Cir. 1981) (unpublished table decision)).

"Evidence from years outside the years in issue can be relevant if it provides context to evaluate the taxpayer's overall requisite profit motive." *Den Besten v. Commissioner*, T.C. Memo. 2019-154, at \*18; *see also* § 6214(b). Nonetheless, "we look at the profit picture in respect of the years at issue in terms of prior actual and anticipated future operations as they appeared at those times; actual profits or losses in those and subsequent years have probative, although not determinative, significance in such evaluation." *Smith v. Commissioner*, T.C. Memo. 1993-140, 1993 WL 99970, at \*9.

**[\*14]** B.    *Ascertaining the Activities at Issue*

Multiple undertakings of a taxpayer may be treated separately when the undertakings are not sufficiently interconnected. Treas. Reg. § 1.183-1(d)(1). "The most important factors in making that determination are the degrees of organizational and economic interrelationships of the undertakings, the business purpose served by carrying on the undertakings separately or together, and the similarity of the undertakings." *Judah v. Commissioner*, T.C. Memo. 2015-243, at \*21. "[T]he Commissioner generally accepts the taxpayer's characterization of two or more undertakings as one activity unless the characterization is artificial or unreasonable." *Id.* at \*21–22.

The Sullivans engaged in software development, home construction, and mulching activities under the Traders Abacus entity, but the activities were predominantly separate and featured only minimal interconnectivity. The activities did not provide inherent benefits to each other beyond the ease and convenience of the occasional commingling of funds and the shared use of the Bobcat equipment. Under these circumstances, and because neither the Sullivans nor respondent urge us to consider them together, we will examine the factors as they relate to the Sullivans' software development, home construction activities, and mulching business independently.

C.    *Application of the Caselaw and Regulatory Factors*

This is a close case. Given the caselaw and the nine factors set forth in the regulations, *see supra* Opinion Part III.A, and on the basis of all the facts and circumstances, we conclude that Mr. Sullivan engaged in software development activities with a profit motive for each taxable year. With respect to the Sullivans' home construction activities for each year at issue, we find that the Sullivans held a profit motive with respect to the 47.71-acre property, but not the 3.89-acre parcel.

With respect to Leaf-Cutter, Ms. Sullivan's mulching business, we readily find that the Sullivans have failed to carry their burden of establishing that the activity was engaged in for profit. The Sullivans testified that the business was both established and terminated because of safety concerns in 2019. Ms. Sullivan testified that the biggest difference between Leaf-Cutter and their own development of the Lincolnville lot was that Ms. Sullivan would be completing work for clients for pay, and that she performed tree removal for others.

[*15] Ms. Sullivan's assertion that she was hired by others is unsupported by the documentary evidence in this case. It is further belied by the facts that the Sullivans reported no income, but significant expenses, from the Leaf-Cutter venture in 2019 and that she did not record the time she spent in furtherance of the business. She testified that she spent approximately 50 hours per week on Leaf-Cutter activities in 2019, but we do not find this part of her testimony credible, considering the amount of time she and Mr. Sullivan were dedicating to development of the Lincolnville lot during the same timeframe.

Under these circumstances we find that Ms. Sullivan did not engage in a mulching business for profit in 2019, and respondent's disallowance of deductions reported on the corresponding 2019 Schedule C is sustained. We now turn to explaining our conclusions with respect to SelfChanger and the development of the Lincolnville lot in greater detail, examining the nine factors in the regulations and the relevant precedent.

1.   *The Manner in Which the Taxpayer Carries On the Activity*

A taxpayer who works in a "businesslike manner" and "maintains complete and accurate books and records" is more likely to have a profit motive. Treas. Reg. § 1.183-2(b)(1). A "businesslike manner" can be inferred from the taxpayer's maintenance of "complete and accurate books and records," *id.*, and a reasonable business plan, *Den Besten*, T.C. Memo. 2019-154, at *20 ("Having a business plan may suggest that a taxpayer conducted the activity in a businesslike manner.").

One of the most important indications of whether an activity is being carried on in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income. *Carmody v. Commissioner*, T.C. Memo. 2016-225, at *21–22 (citing *Dodge v. Commissioner*, T.C. Memo. 1998-89, 1998 WL 88175, at *5, *aff'd*, 188 F.3d 507 (6th Cir. 1999) (unpublished table decision)). Working in a businesslike manner includes whether the taxpayer conducts the activity "in a manner substantially similar to other activities of the same nature which are profitable" and whether the taxpayer changes "operating methods, adopt[s] . . . new techniques or abandon[s] . . . unprofitable methods in a manner consistent with an intent to improve profitability," questions we consider in analyzing this factor's application to the instant case. Treas. Reg. § 1.183-2(b)(1).

**[\*16]**                    a.      *Software Development Activities*

Our review of the record makes clear that Mr. Sullivan engaged in his software development activities in a businesslike manner. Mr. Sullivan created a business plan, conducted surveys to identify the consumer base, hired employees to assist him in developing the app, and ran advertisements, all of which are reasonable actions businesses take to generate income. Although there were instances of commingling of business and personal funds, the Sullivans testified that they held separate bank accounts and maintained ledgers for Traders Abacus's activities.

Mr. Sullivan testified that he ceased development of SelfChanger at various times from 2005 through 2019, and during the years at issue he decided to simplify the application to make it more marketable. Further, following the years at issue Mr. Sullivan once again halted activities relating to development of SelfChanger because he felt that the application's inability to retain customers would prevent it from becoming a commercial success. Mr. Sullivan testified further that because he was not actively pursuing its development, he had reduced its operating expenses to approximately $35 per month in case he ever felt the venture might become profitable.

Mr. Sullivan's reasonable business decisions to adopt new ideas for SelfChanger and to entirely shelve its development at times he felt it had no profitable outlook are consistent with having a profit motive. *See Carmody*, T.C. Memo. 2016-225, at \*21 ("Perhaps the most important indication of whether an activity is being carried on in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income."); Treas. Reg. § 1.183-2(b)(1). Despite much of the Sullivans' evidence on this factor occurring outside the years at issue, the evidence, in conjunction with their activities during the years at issue, indicates that Mr. Sullivan ran SelfChanger in a businesslike manner. Thus, this factor favors the Sullivans with respect to their software development activities.

b.      *Home Construction Activities*

The Sullivans funded their home construction activities from Mr. Sullivan's wages and their retirement savings. As with Mr. Sullivan's software development, the Sullivans hired employees to work as laborers for their home construction projects and used software to

**[\*17]** organize and track payroll expenses. Although they did not produce a formal, written business plan, Mr. Sullivan testified about how various aspects of the Lincolnville lot aligned with their plan to develop a minor subdivision of passive homes. The absence of a formal, written business plan is not determinative, especially when the taxpayer had some form of business plan and pursued it consistently. *See Annuzzi v. Commissioner*, T.C. Memo. 2014-233, at \*16.

On the other hand, the Sullivans generally treated the 3.89-acre parcel as their primary residence upon moving to the Lincolnville lot. Mr. Sullivan testified that they viewed the entire Lincolnville lot as a nice place to live for most, if not the rest, of their lives, and Mr. Sullivan had promised Ms. Sullivan a house on the property within five years. The Sullivans provided a driveway permit waiver, a land use application, and a wastewater disposal system application as evidence of their profit motive regarding the development of the Lincolnville lot. These applications, however, relate to the 3.89-acre parcel specifically, the portion of the property the Sullivans treated as their primary residence. Further, the land use application describes the project as a residence, and the wastewater disposal system application indicates that it is intended to serve a single-family dwelling unit with four bedrooms, not apartments or the passive homes that the Sullivans purportedly sought to build.

This factor—the manner in which the taxpayer carried on the activity—favors the Sullivans with respect to their home construction activities on the 47.71-acre parcel, but not the 3.89-acre parcel.

2. *The Expertise of the Taxpayer and His or Her Advisors*

A taxpayer's preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with experts in the activity, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Treas. Reg. § 1.183-2(b)(2). Where the taxpayer has such knowledge or advice but does not carry on the activity in accordance with good practice, a lack of intent to derive profit may be indicated. *Id.*

a. *Software Development Activities*

Mr. Sullivan has extensive experience in the fields of sales, digital advertising, and communications. Though he is neither a psychologist nor a psychiatrist, Mr. Sullivan testified that he spent significant time

**[\*18]** reading research papers and speaking with industry experts about topics relating to human psychology and addiction. Beyond identifying the database he used to research the academic literature, he did not specify which resources or experts he consulted. *See Stettner v. Commissioner*, T.C. Memo. 2017-113, at \*11 (finding this factor neutral where taxpayer failed to specify which online resources he researched, but the Commissioner otherwise did not convince the Court that taxpayer lacked requisite expertise to conduct activity profitably).

Additionally, Mr. Sullivan hired employees to help develop the SelfChanger application at various points. *See Wondries v. Commissioner*, T.C. Memo. 2023-5, at \*8–10 (finding that hiring an expert and deferring to their knowledge is indicative of profit motive). He first hired individuals with knowledge of machine learning before ceasing the application's development in 2016. In March 2019, after reviving his efforts with respect to SelfChanger with a simpler business plan, he again hired an employee, Ms. Sirianni, who worked on site and provided assistance drafting conversation scripts and conducting surveys. Ms. Sirianni holds a degree in sociology, and Mr. Sullivan believed her personality was fit to work on sensitive issues such as pornography addiction. Further, following the years at issue, Mr. Sullivan hired two software programmers to work on SelfChanger full time in 2020.

Mr. Sullivan's successful business career in the broadcast technology industry, his time and effort spent self-studying human psychology, and the fact that he hired skilled employees to assist in technical aspects of SelfChanger's business all indicate that he acted with sufficient experience with respect to the software development activities. This factor favors the Sullivans with respect to those activities.

b.    *Residential Construction Activities*

The Sullivans, despite having no formal training or education on the subject, have extensive experience with home construction. Since they were married, each time they moved the Sullivans either significantly remodeled their home or constructed a new one. Two of their three homes—the one in Minnesota and the Hingham residence— sold for a profit following the Sullivans' construction projects. Further, the Sullivans hired subcontractors to complete portions of each project that they felt they lacked the skills to complete.

[*19] Ms. Sullivan testified that she relied on advice about developing real estate in Maine from members of the Maine Forestry Owners' Association. Like Mr. Sullivan with respect to his consultation of industry experts, Ms. Sullivan did not specify whom she spoke to or what specific advice she received from her acquaintances at the Maine Forestry Owners' Association. *See Stettner*, T.C. Memo. 2017-113, at *11.

Respondent argues that the nature and scale of the Sullivans' plan to build passive homes on the 47.71-acre parcel of the Lincolnville lot was not consistent with their prior projects and that the Hingham residence was remodeled over the course of 20 years, which is a timeline not consistent with a profit motive. Under the circumstances, we find that the Sullivans' prior experience and success remodeling and constructing homes indicate that they had sufficient experience to possess a profit motive with regard to the Lincolnville lot. This factor favors the Sullivans with respect to their home construction activities.

### 3. *The Time and Effort That the Taxpayer Spent Carrying On the Activity*

When a taxpayer devotes considerable time and effort to an activity, "particularly if the activity does not have substantial personal or recreational aspects," that devotion may indicate that the taxpayer had a profit motive. Treas. Reg. § 1.183-2(b)(3). Further, when a taxpayer "withdraw[s] from another occupation to devote most of his energies to the activity," that also may support a finding that the taxpayer had a profit motive. *Id.* Even when a taxpayer devotes only limited time to an activity, if the taxpayer "employs competent and qualified persons to carry on such activity," then that too may indicate a profit motive. *Id.*

#### a. *Software Development Activities*

Mr. Sullivan spent considerable time developing SelfChanger. In 2018 and 2019 he spent approximately 20 to 30 hours per week on the venture in addition to his full-time job with Imagine. Mr. Sullivan testified that in 2018 he transitioned to a less demanding role with Imagine in order to spend more time with his family and develop his projects. In 2019, Mr. Sullivan transitioned back into a demanding sales role with Imagine, but he testified that during that time he continued devoting approximately 30 hours per week to SelfChanger. Further, Mr. Sullivan's decision to hire Ms. Sirianni to assist with the development

[*20] indicates that he was dedicating requisite time and effort to achieving profitability. This factor favors the Sullivans with respect to their software development activities.

b.     *Residential Construction Activities*

Ms. Sullivan dedicated nearly all of her free time to their plans for developing the Lincolnville lot. The Sullivans sold the Hingham residence and moved to live in a tent on the Lincolnville lot so that they could allocate more time to its development. Ms. Sullivan testified she worked through holidays, birthdays, and anniversaries in furtherance of developing the Lincolnville lot. This factor heavily favors the Sullivans with respect to their home construction activities.

4.     *The Expectation That Assets Used in the Activity May Appreciate in Value*

Even if a taxpayer receives no income from operating his enterprise, he may intend to derive a profit from the potential appreciation of his business assets. *See* Treas. Reg. § 1.183-2(b)(4). A profit motive may be inferred if the appreciation of assets plus future income are expected to be sufficient to recoup accumulated losses of prior years. *Himmel v. Commissioner*, T.C. Memo. 2025-35, at *19 (citing *Carmody*, T.C. Memo. 2016-225, at *28).

a.     *Software Development Activities*

Mr. Sullivan expected the SelfChanger application to appreciate in value. He conducted research on the addressable market, attempted to attract and retain customers through advertisements, and adopted new approaches to development of the application that he thought would make it more marketable. Mr. Sullivan sustained years of losses throughout the venture's startup phase. *See WP Realty, LP v. Commissioner*, T.C. Memo. 2019-120, at *42 ("A taxpayer's willingness to sustain continued operating losses because of his or her subjective expectation that the assets used in the activity will increase in value is indicative of a profit motive." (citing *Engdahl v. Commissioner*, 72 T.C. 659, 669 (1979))).

Respondent argues that Mr. Sullivan never obtained an appraisal of the app, which indicates a lack of an expectation of an increase in value. However, on the basis of his research of the market, his experience with digital marketing, and his extensive career in sales, we conclude that Mr. Sullivan had a reasonable expectation that an

**[\*21]** application he was developing could appreciate in value. Moreover, that Mr. Sullivan took steps to protect the intellectual property associated with his software development activities, *see supra* Findings of Fact Part II.A, further suggests he expected the assets of the business to appreciate in value.

### b. *Residential Construction Activities*

The Lincolnville lot was acquired with the expectation that it would appreciate in value. "[E]ven if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation." Treas. Reg. § 1.183-2(b)(4); *see also Walters v. Commissioner*, T.C. Memo. 2022-17, at \*13. Here, the Sullivans planned to develop a small subdivision of homes on the Lincolnville lot, an activity in which taxpayers cannot expect current income.

Further, Mr. Sullivan testified about finding the Lincolnville lot's price favorable when considering its access to Boston and that the area was growing. The Sullivans ultimately sold the 47.71-acre parcel in January 2025 for significantly more than their purchase price. This factor heavily favors the Sullivans with respect to their home construction activities.

### 5. *Success in Carrying On Other Similar or Dissimilar Activities*

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit . . . ." Treas. Reg. § 1.183-2(b)(5).

### a. *Software Development Activities*

Mr. Sullivan's lack of success with respect to software development stretches as far back as his trading software business, which he shelved in 2005, and continued with SelfChanger, which he started in 2014. Despite halting and restarting development of multiple software development projects, Mr. Sullivan was never able to earn a profit. This factor favors respondent with respect to the Sullivans' software development activities.

**[\*22]**  b.  *Residential Construction Activities*

The Sullivans displayed extensive past success in home construction. They sold for a profit two out of three of their prior homes, which they either built or significantly remodeled. The Sullivans did much of the work themselves with respect to their prior homes, and hired contractors for tasks they did not have the skills or equipment to complete themselves, which was also true with respect to their plans for the Lincolnville lot. This factor favors the Sullivans with respect to their home construction activities.

6.  *History of Income or Losses with Respect to the Activity*

A series of losses during the startup stage of an activity may not necessarily prove that an activity is not engaged in for profit. Treas. Reg. § 1.183-2(b)(6). However, if losses continue to be sustained beyond the period which customarily would be necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may indicate that the activity is not engaged in for profit. *Id.* Nonetheless, where losses are due to "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer," then this inference does not typically arise. *Id.* Examples of "fortuitous circumstances" include "drought, disease, fire, theft, weather damages, . . . or depressed market conditions." *Id.* Further, "[i]f an activity's cumulative losses are of such magnitude that an overall profit on the entire operation, including recoupment of past losses, could not possibly be achieved, the activity's history of losses is compelling evidence of a lack of intention to make a profit." *Carmody*, T.C. Memo. 2016-225, at \*25 (first citing *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (2d Cir. 1967); and then citing *Foster v. Commissioner*, T.C. Memo. 2012-207, 2012 WL 3000350, at \*8).

a.  *Software Development Activities*

The Sullivans argue that the losses they sustained during the years at issue from SelfChanger were within the project's startup period. There was no evidence presented as to the customary startup period for software development, but the disputed losses were incurred only five years after Mr. Sullivan began pursuing the development of SelfChanger. Further, there were times at which Mr. Sullivan was not pursuing development of SelfChanger; and when he reengaged his efforts, he employed new business strategies that extended the time

[*23] required to develop the application. We view five years as a reasonable startup period for a software business of Traders Abacus's scale, given Mr. Sullivan's varied level of engagement with SelfChanger throughout the period. Considering that the purported startup period featured times at which Mr. Sullivan was not diligently pursuing development of SelfChanger, we do not view five years as an unreasonably long startup period for a software business operating at Traders Abacus's scale. Thus, we find that the losses sustained during the years at issue were within Traders Abacus's startup period. This factor favors the Sullivans with respect to their software development activities.

### b. *Residential Construction Activities*

The Sullivans' history of building or remodeling homes and selling them for a profit indicates that they likely had a profit motive when they decided to pursue the project on the Lincolnville lot. We have found that a construction business of 17 years is not within its startup period, *Verrett v. Commissioner*, T.C. Memo. 2012-223, at *10, but that five years was within the startup period for a land-clearing business, *see Leonard v. Commissioner*, T.C. Memo. 1993-472, 1993 WL 406424, at *6. The Sullivans' plans with respect to the Lincolnville lot required clearing lots to prepare for eventual construction. The losses in the years at issue with respect to the development of the Lincolnville lot were incurred within three years of their acquiring the land. We thus view the losses as being incurred within the project's startup period. Our analysis on this factor is further supported by the fact that the Sullivans sold a portion of the Lincolnville lot for profit after the years at issue. This factor favors the Sullivans with respect to their home construction activities.

### 7. *Amount of Profits, if Any, Which Are Earned*

In an otherwise money-losing venture, a taxpayer's derivation of some profits may support the existence of a profit motive. *See* Treas. Reg. § 1.183-2(b)(7). An "occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." *Id.*

### a. *Software Development Activities*

The Sullivans argue that SelfChanger was a prototypical highly speculative venture that carried the possibility of significant profit if it

**[\*24]** ultimately succeeded. Respondent argues that Mr. Sullivan's history of sustained losses in software development and lack of any profit whatsoever demonstrates that the venture was not being entered into for profit during the years at issue. Under these circumstances, we find that this factor weighs in respondent's favor.

b. *Residential Construction Activities*

The record establishes that the Sullivans derived profit from the sale of homes that they constructed or significantly remodeled. Mr. Sullivan testified that in addition to using them as their primary residences, they also sought to profit from their construction work on their prior homes. This includes the sale of their Minnesota residence upon moving to Montana in 1987, and the Hingham residence, which they renovated and ultimately sold for a profit in 2018. This factor favors the Sullivans with regard to their home construction activities.

8. *Financial Status of Petitioners*

When a taxpayer has substantial income or capital at his disposal from sources other than the activity in question, such evidence may indicate that he did not enter into that activity with a profit motive. *See* Treas. Reg. § 1.183-2(b)(8). This is particularly true if the losses from the activity generate substantial tax benefits. *Id.*

Mr. Sullivan earned significant wages working at the executive level for Imagine Communications during the years at issue. He earned $355,734 in 2017, $178,332 in 2018, and $226,857 in 2019. The losses generated by the Sullivans' Schedule C activities thus provided tax benefits in the form of deductions to offset Mr. Sullivan's wage income.

On the other hand, the Sullivans used the proceeds from the sale of the Hingham residence, and took early distributions from their retirement accounts, to pursue their software and home construction activities. Further, Mr. Sullivan's significant income did not translate to a lavish lifestyle. Quite the opposite. For much of the time at issue, they lived in a tent that they moved around depending on where on the Lincolnville lot they were working, and forwent leisure and recreational pursuits in order to continue their work. We find this factor to favor the Sullivans with regard to their software and home construction activities.

**[\*25]**      9.      *Elements of Personal Pleasure or Recreation*

Finally, when a taxpayer derives personal pleasure from an activity or finds it recreational, such evidence may suggest that the taxpayer entered into the activity for reasons other than profit. *See* Treas. Reg. § 1.183-2(b)(9). However, this factor is not necessarily dispositive, as "suffering has never been made a prerequisite to deductibility." *Jackson v. Commissioner*, 59 T.C. 312, 317 (1972).

"The fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors." *Young v. Commissioner*, T.C. Memo. 2025-95, at \*39. That said, "where the possibility for profit is small . . . and the possibility for gratification is substantial, it is [often] clear that the latter possibility constitutes the primary motivation for the activity." *Dodge v. Commissioner*, 1998 WL 88175, at \*7 (quoting *Burger v. Commissioner*, T.C. Memo. 1985-523, *aff'd*, 809 F.2d 355 (7th Cir. 1987)).

     a.      *Software Development Activities*

There is little evidence in the record pertaining to Mr. Sullivan's personal enjoyment of software development. His general sense of curiosity and ingenuity paired with his background in digital communications indicates that regardless of any enjoyment derived, he possessed the ability to monetize his skills and knowledge in these related fields. This factor favors the Sullivans with respect to the software development venture.

     b.      *Home Construction Activities*

The Sullivans testified extensively about enjoying the challenges that come with developing land and building things and about how they sought to have a place to live and a project to which they could dedicate the rest of their lives. However, these ventures were physically taxing. In addition to living in less-than-ideal conditions to save time and resources, the Sullivans testified to the extensive labor required to clear trees, install a road, and otherwise prepare to build structures from raw land. In the end, the Sullivans derived minimal personal enjoyment or benefit with respect to their efforts to develop the 47.71-acre parcel.

With respect to the 3.89-acre parcel, however, the Sullivans derived extensive personal benefit; namely by treating the parcel as

[*26] their primary residence for much of the years at issue. Further, documentary evidence in the record and their testimony indicate that their plans with respect to the 3.89-acre parcel included a residence and a barn structure to be used for storage, rather than a series of passive homes like those they sought to build on the 47.71-acre parcel. We find this factor favors the Sullivans with respect to the development of the 47.71-acre parcel.

IV.  *Conclusion*

In sum, on the basis of the foregoing analysis, we find that the Sullivans engaged in the software development activities for profit, and that they held a profit motive with respect to a portion of their home construction activities. Specifically, we find that the Sullivans held a profit motive with respect to the 47.71-acre parcel of the Lincolnville lot, but that aspects of personal use and the lack of a plan to commercialize the 3.89-acre parcel suggest they did not hold a profit motive with respect to it.

Because of the commingling of, and inability to clearly allocate amongst, the parcels, and the time, effort, and resources spent developing each, we find that allocating the Sullivans' Schedule C home construction expenses in proportion to the total land area of each parcel would be improper and arbitrary. In other words, we do not believe the Sullivans incurred expenses in proportion to the total land area of each parcel of the Lincolnville lot. To arrive at an allocation we believe properly reflects the extent of expenses the Sullivans incurred in developing the 47.71-acre parcel, we start with a division proportional to the relative land area of the parcels and make a special allocation that takes into consideration the fact that the Sullivans used the same construction equipment and human capital to develop both parcels and did not keep separate books and records that would enable them to clearly identify to which parcel certain expenses were related. The Sullivans' lack of recordkeeping and any resulting inexactitude weigh heavily against them in our making the special allocation. *See Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930).

On one hand, it appears that most of the time, effort, and resources the Sullivans expended were in furtherance of developing the 3.89-acre parcel for which there was no profit motive. The Sullivans viewed the Lincolnville lot as the place where they would retire and live most of the rest of their lives. Much of the documentary evidence in the record showcases their efforts to build a residence and barn on the

**[*27]** 3.89-acre parcel. Moreover, when staying at the Lincolnville lot and after moving there permanently, the Sullivans resided on the 3.89-acre parcel.

On the other hand, the fruits of their development efforts culminated primarily on the 47.71-acre parcel. On it, they placed the Traders Abacus office and built access roads, and they eventually sold it for a significant profit after the years at issue. Further, the Sullivans testified credibly about their lifelong goal to build a development of homes, which indicates that such a development was a compelling motivation for their decision to move to and develop the Lincolnville lot.

The 3.89-acre portion makes up approximately 7.5% of the total land area of the Lincolnville lot. With that starting point in mind, and considering the Sullivans' extensive personal use of the 3.89-acre parcel and their lack of recordkeeping, and that their documentary evidence primarily pertained to residential projects on the 3.89-acre parcel, we find it appropriate to allocate 25% of their total home construction expenses to the 3.89-acre parcel. Accordingly, we hold the Sullivans are entitled to deductions for all expenses incurred to develop SelfChanger, and 75% of all expenses incurred to develop the Lincolnville lot to the extent, absent an agreement of the parties, that the Court finds the expenses are substantiated in further proceedings in this case.

In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*